**FILED**

**November 15, 2013**

In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

DOROTHY A. MILLICAN, as Personal )
Representative of the Estate of DAREN )
M. LAFAYETTE, and on her own behalf )
as statutory beneficiary, ) No. 30185-1-III
)
Appellant, )
)
v. )
)
N.A. DEGERSTROM, INC., a )
Washington corporation, )
)
Respondent, )
) OPINION PUBLISHED
MICO, INCORPORATED, a Minnesota ) IN PART
corporation; JAMES R. BONNER and )
JANE DOE BONNER, husband and wife )
and the marital community comprised )
thereof, d/b/a INDUSTRIAL POWER )
BRAKE COMPANY; JOHN DOE )
MANUFACTURER, 1 through 10; JOHN )
DOE CORPORATIONS, 1 through 10, )
)
Defendants. )

SIDDOWAY, A.C.J. — Dorothy Millican's 19-year-old son, Daren Lafayette, was

killed in a job related accident while working construction on the Flowery Trail Road,

located in Stevens and Pend Oreille counties. As personal representative of her son's

estate and claiming rights as a statutory beneficiary, she brought a wrongful death action against the general contractor, N.A. Degerstrom Inc., and others. The jury returned a defense verdict from which Ms. Millican appeals.

Ms. Millican contends on behalf of her son's estate that the trial court erred in (1) admitting evidence that Degerstrom contractually delegated sole responsibility for the safety of employees to its subcontractors, (2) denying the estate's motion for a new trial, and (3) refusing to instruct the jury that Degerstrom owed a duty to the public traveling through the construction site. She argues individually that the court erred in dismissing her claims on the basis that she did not qualify as a statutory beneficiary.

We conclude that it was an abuse of discretion for the trial court to deny the estate's motion seeking to limit Degerstrom's evidence and argument that it required Mr. Lafayette's employer to assume sole responsibility for the protection and safety of its own employees. Degerstrom's mischaracterization to this effect pervaded its presentation and could not be cured by the concluding instructions to the jury. The estate and Ms. Millican fail to demonstrate any other error, however.

We affirm the trial court's dismissal of Ms. Millican's individual claim but reverse the judgment on the jury's verdict and remand for a retrial of the estate's claims.

FACTS AND PROCEDURAL BACKGROUND

In April 2005, the United States Department of Transportation Federal Highway Administration awarded N.A. Degerstrom Inc. a contract to improve a five-mile stretch

2

of Flowery Trail Road. Degerstrom subcontracted with Sharp-Line Industries Inc. to install signs and paint road stripes. The subcontract agreement required Sharp-Line to indemnify Degerstrom from any liability it suffered as a result of Sharp-Line's negligence. The subcontract also contained the following provision imposing responsibility on Sharp-Line for work site safety:

> Subcontractor accepts responsibility to prevent accidents to any person who may be close enough to its operation to be exposed to Subcontractor's work-related hazards. Subcontractor shall be solely responsible for the protection and safety of its employees, for final selection of additional safety methods and means, and for daily inspection of its work area and safety equipment. Failure on the part of Contractor to stop unsafe Subcontractor practices shall in no way relieve Subcontractor of its responsibility hereunder. Subcontractor shall conform to Contractor's site-specific safety plan(s) and policies as directed by Contractor in writing or by Contractor's project supervisor.

Clerk's Papers (CP) at 3227.

One of Sharp-Line's vehicles used on the Flowery Road project was a 1978 Chevrolet auger truck used to drill holes in the ground for sign posts. The truck was equipped with outriggers, which were extended to stabilize it while the auger was being used, and a hydraulic tamper that compacted soil around the sign posts. The auger and tamper were powered by a device that used the truck's transmission to transmit power from the engine. To engage the device, the truck's engine had to be running and the transmission had to be in neutral.

3

On the day Mr. Lafayette was killed, he and Sharp-Line's crew foreman, William Wright, were installing highway signs. Toward the end of the day, Mr. Wright parked the auger truck facing downhill and Mr. Lafayette and Mr. Wright began installing the last sign. Another subcontractor had set up traffic control with pilot cars because the auger truck encroached on the roadway. Mr. Wright put the truck in the parking gear, left the engine on, and engaged a supplemental brake device called a lever lock, which locks hydraulic fluid in the braking system. He did not, however, set the emergency brake or chock the tires. The men walked around behind the truck and Mr. Wright deployed the outriggers as he drilled a hole for the sign post. Mr. Wright then retracted the outriggers while the two men installed the sign post and began compacting soil around the post with the hydraulic tamper.

As he worked, Mr. Wright saw Mr. Lafayette suddenly drop the tamper and begin running after the truck, which was rolling across the road. Mr. Lafayette managed to pull himself into the cab and steer the truck away from a line of vehicles following a pilot car in the opposite lane. One of the drivers of the vehicles later testified that a collision seemed inevitable until Mr. Lafayette turned the wheels. Apparently the brakes had failed, because Mr. Lafayette was unable to slow or stop the truck. The truck continued to accelerate as Mr. Lafayette steered it down the hill where it unavoidably crashed, causing his death.

4

Dorothy Millican was appointed the personal representative of her son's estate and, on behalf of the estate, sued Degerstrom, Mico Inc. (the manufacturer of the lever lock), and James and Jane Doe Bonner d/b/a Industrial Power Brake (who had done maintenance and repair of the auger truck) for damages for wrongful death. She asserted an individual cause of action as well, "as a statutory beneficiary defined in RCW 4.20.020," a provision of the wrongful death statute. CP at 8.

In suing Degerstrom, she alleged that it had a nondelegable duty as general contractor to ensure Sharp-Line's compliance with health and safety regulations and contractual safety duties, had allowed "illegal, unsafe, ultra-hazardous practices resulting in an unsafe work place," CP at 20, and had thereby proximately caused her son's death.

Before trial, the court granted the defendants' joint motion for partial summary judgment dismissing Ms. Millican's individual wrongful death claim. It found no evidence creating a genuine issue of fact that she was dependent on her son for support qualifying her as a beneficiary under RCW 4.20.020. It denied the estate's motion in limine to exclude evidence or argument by Degerstrom that it did not exercise or retain supervisory control or authority over Sharp-Line during construction operations. At the conclusion of a three-week trial, the jury found none of the defendants liable. The trial court denied the estate's motion for a new trial against Degerstrom and Mr. Bonner. The estate and Ms. Millican appealed.

ANALYSIS

Ms. Millican, on behalf of the estate and individually, makes four assignments of error. In the published portion of this opinion, we address the estate's assignment of error to the trial court's refusal to exclude evidence that Degerstrom delegated sole responsibility for the safety of Sharp-Line's employees to Sharp-Line.

In the unpublished portion, we address the estate's assignment of error to the trial court's denial of its motion for judgment as a matter of law, its refusal to instruct the jury that Degerstrom owed a duty to the public traveling through the construction site, and Ms. Millican's assignment of error to dismissal of her individual claim.

*Refusal to limit evidence and argument
of delegated responsibility for safety.*

Early in the proceedings below, Degerstrom moved for summary judgment, arguing that Sharp-Line had assumed the contractual obligation to comply with all safety laws and plans. The trial court denied the motion on the basis of Degerstrom's nondelegable duty to ensure a safe work environment. In its motions in limine, the estate reminded the trial court of Degerstrom's legal position, which it characterized as "factually inaccurate, legally misleading . . . , and inconsistent with [the] court's prior denials of its motions for summary judgment." CP at 1549. It asked the court to exclude evidence or argument by Degerstrom that it did not exercise or retain supervisory control or authority over Sharp-Line during construction operations.

6

In orally ruling on the motion, the trial court observed that "the factual issues . . .
are all going to get in front of the jury" and that it viewed the parties' disagreement over
Degerstrom's *legal duty* as an instructional matter. Report of Proceedings (RP) at 2.
Critically, when the estate then sought to clarify whether, in light of that reasoning, its
motion to exclude evidence and argument about *duty* was granted, denied, or reserved for
later rulings, the trial court responded that the motion was denied. RP at 6. The estate's
motion in limine was sufficient to raise and preserve its objection. *State v. McDaniel*,
155 Wn. App. 829, 853 n.18, 230 P.3d 245 (2010) (because the purpose of a motion in
limine is to resolve legal issues outside the presence of the jury, a trial court's ruling
denying a motion in limine is final and the moving party has a standing objection).[1]

At trial, Degerstrom presented extensive evidence and argument on duty,
informing the jury in opening statement, through evidence, and in closing argument that
it is "typical," "reasonable," "industry standard," and most important, "appropriate" and
"allowable under Washington law" for a general contractor like Degerstrom to delegate
its responsibilities, and for subcontractors like Sharp-Line to agree, by contract, to

---

[1] Degerstrom argues that the estate waived its objection by later questioning
witnesses about the contract and its delegation provision. But once the evidence was
permitted, it was not a waiver for the estate to try to turn the evidence to its advantage to
any extent possible.

7

assume sole responsibility for the protection and safety of its own employees. RP at 40-54, 845-47.[2]

The general rule in Washington is that a principal is not liable for injuries caused by an independent contractor whose services are engaged by the principal. *Stout v. Warren*, 176 Wn.2d 263, 269, 290 P.3d 972 (2012); RESTATEMENT (SECOND) OF TORTS § 409 (1965). Two categories of exceptions to this rule exist at common law, the first being exceptions that subject the principal to liability for its own negligence and the second being exceptions that subject the principal to liability for its contractor's tortious conduct even if the principal has itself exercised reasonable care. *Compare* RESTATEMENT (SECOND) §§ 410-415 (direct liability) *with* §§ 416-429 (vicarious liability). The latter category of exceptions giving rise to vicarious liability comprise duties said to be nondelegable, as explained by the *Restatement*:

> The rules . . . do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant.
> The statement commonly made in such cases is that the employer is under a duty which he is not free to delegate to the contractor. Such a "non-delegable duty" requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted.

---

[2] Relevant portions of Degerstrom's opening statement and closing argument are included in an appendix to this published portion of the opinion.

RESTATEMENT (SECOND) ch. 15, topic 2 introductory note. Circumstances that give rise to a principal's nondelegable duty include precautions required by statute or regulation. *Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 283, 635 P.2d 426 (1981) (citing *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 582 P.2d 500 (1978)); RESTATEMENT (SECOND) § 424; *Pettit v. Dwoskin*, 116 Wn. App. 466, 472 n.17, 68 P.3d 1088 (2003) (observing that while § 424 has not been formally adopted in Washington, "[i]t has, however, been frequently discussed and relied upon").[3]

Even where an exception to the general rule of nonliability applies, a principal ordinarily owes its duty to only third parties *other than* the employees of its independent contractors. *Stout*, 176 Wn.2d at 276 (quoting *Epperly v. City of Seattle*, 65 Wn.2d 777, 783, 399 P.2d 591 (1965) for its recognition of "'the distinction between the level of duty to members of the public and the duty of the owner to one engaged to work upon the project as the employee of an independent contractor'"); *Tauscher*, 96 Wn.2d at 281. The policy considerations that are said to support excluding an independent contractor's employees from the protected class are found in the workers' compensation systems in place in most states. The reasoning is that by making contract payments to an

---

[3] RESTATEMENT (SECOND) § 424 provides:
"One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."

independent contractor that presumably include workers' compensation premiums as overhead, the principal has already assumed some financial responsibility for the safety of its employees. *Id.* at 281-82; *Stout*, 176 Wn.2d at 276-77.

The prevailing common law on these matters notwithstanding, Washington has long refused to exclude a subcontractor's employees from a general contractor's duty of care on either a "no duty" or "no duty to independent contractor employees" rationale. It has instead found nondelegable duties on the part of the general contractor, meaning that the general contractor is "[held] liable . . . although he has himself done everything that could reasonably be required of him." W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 511 (5th ed.1984)). *Prosser* observes that it is difficult to suggest the criterion by which the nondelegable character of a duty may be determined, "other than the conclusion of the courts that the responsibility is so important to the community that the employer [here, the general contractor] should not be permitted to transfer it to another." *Id.* at 512.

Before the enactment and effectiveness of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, our Supreme Court held that a general contractor had a duty to provide adequate safety precautions for its subcontractors' employees under exceptions from the general rule of liability based in

common law, statute, and contractual assumption of duty. *Kelley*, 90 Wn.2d at 330.[4] The

common law basis of the duty cited by *Kelley* is the duty, within the scope of a

principal's retained control, to provide a safe place of work. The test of control is not

actual interference with the work of the subcontractor, but the right to exercise such

control. *Id.* at 330-31 (citing, among other authority, *Restatement (Second)* § 414). The

statutory basis of the duty cited in *Kelley* was former RCW 49.16.030 (1919), which

imposed a duty on all employers to furnish a reasonably safe place of work, with

reasonable safety devices, and to comply with state safety regulations. *Id.* at 333. *Kelley*

held that the statute created a "nondelegable duty" on the part of the general contractor.

*Id.*

With WISHA, the legislature revised the statutory duty, providing that "[e]ach

employer . . . shall comply with the rules, regulations, and orders promulgated under

[chapter 49.17 RCW]." RCW 49.17.060(2). This specific duty to comply with WISHA

regulations is owed to all of the employees at work on the job site as members of the

protected class. *Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 673, 709 P.2d 774 (1985).

In *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 463-64, 788 P.2d 545 (1990), the Supreme

Court noted that WISHA's predecessor statute created a nondelegable duty on general

contractors to provide a safe place to work for employees of subcontractors and that

---

[4] The accident and injury in *Kelley* took place in December 1972, prior to
WISHA's effective date of June 7, 1973. LAWS OF 1973, at ii; 90 Wn.2d at 326.

11

"[t]he policy reasons behind the court's holdings have not changed and give added force to the language of WISHA." It characterized the general contractor's responsibility, being concurrent with that of its subcontractors but primary, as a duty to "ensure compliance with WISHA and its regulations." *Id.* at 463.

In Washington, then, a general contractor not only has direct liability for a breach of its common law duties arising from retained control, but when it comes to violations of WISHA, vicarious liability for breach of a duty that is nondelegable. A violation of WISHA by a subcontractor's employee is therefore not only chargeable to the subcontractor, it is also chargeable to a general contractor—"the primary employer," whose supervisory authority "places the general in the best position to ensure compliance with safety regulations." *Id.*

The specific duty clause of RCW 49.17.060 is not the only statute reflecting the legislature's intent that a general contractor's duty for WISHA compliance runs to its subcontractors' employees. The legislature has also authorized contractual risk-sharing of damages and defense costs by general contractors who face such workplace injury claims. RCW 4.24.115 declares certain indemnification agreements to be valid and enforceable including, in the construction context, an agreement by a subcontractor to indemnify a general contractor against liability for damages caused by the negligence of the subcontractor or its agents or employees. *Gilbert H. Moen Co. v. Island Steel Erectors, Inc.*, 128 Wn.2d 745, 759-60, 912 P.2d 472 (1996). The subcontractor is only

12

permitted to indemnify the general contractor to the extent of the subcontractor's negligence. The statute thereby implicitly recognizes that a general contractor may be concurrently liable for its subcontractor's act or omission. And the statute anticipates claims against a general contractor for workplace injury to a subcontractor's employee: it provides that an indemnitor may waive its immunity under industrial insurance, something that would be unnecessary except in the case of a claim by an indemnitor's employee. RCW 4.24.115(1)(b).

Given this statutory authorization of indemnification agreements, the Degerstrom/Sharp-Line contract may well have been "typical" and "industry standard," as Degerstrom drove home during the trial, but not with the legal effect that Degerstrom then suggested to the jury. Indemnification provisions enable the general contractor, if liable to the employee, to recover its defense costs and judgment liability from the culpable subcontractor. They do not enable the general contractor to disavow its primary responsibility for WISHA compliance. *See Moen*, 128 Wn.2d at 753 (enforcing indemnification "allows contractors to allocate 'responsibility to purchase insurance' according to their negotiated allocation of risk and potential liabilities," and set their fees "'founded on their expected liability exposure as bargained and provided for in the contract'" (quoting *McDowell v. Austin Co.*, 105 Wn.2d 48, 54, 710 P.2d 192 (1985); *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 826-27, 881 P.2d 986 (1994))).

13

The facts of *Moen* illustrate the proper role and relevance of delegation and indemnification agreements. The plaintiff in that case was an ironworker, severely injured when he fell from a beam. The Department of Labor and Industries attributed the accident to a lack of safety equipment. It cited the plaintiff's employer, Island Steel Erectors, which it concluded was responsible for providing fall protection equipment. Given Island's immunity from suit for the workplace injury, the plaintiff sued the general contractor—Moen—and others.

Moen had entered into an agreement with Island that required Island to comply with laws, regulations, and the provisions of Moen's contract with the owner, including to comply with safety regulations. The Moen/Island agreement also included an indemnification addendum under which Island agreed to indemnify Moen for damages resulting from any concurrent negligence of Moen and Island resulting from the negligence of Island and its employees.

Moen did not rely on its agreement with Island to argue (as Degerstrom does) that it fulfilled its duty for WISHA compliance by delegating responsibility to Island. Instead, it settled with the plaintiff and sued Island for indemnification. The court held that the indemnification contract was valid and enforceable to the extent of Moen's and Island's concurrent liability for the negligence of Island. In remanding, it pointed out that what remained to be determined were (1) whether Moen and Island were concurrently

negligent and (2) the extent of Island's negligence for which Moen had been required to pay, but as to which it was entitled to be indemnified by Island.

Sharp-Line's agreement to assume sole responsibility and indemnify Degerstrom has no more and no less significance here. If it complies with statute, then as between Sharp-Line and Degerstrom the agreement is controlling. As between Mr. Lafayette and Degerstrom, for any WISHA violation established by the evidence, it is irrelevant.

Degerstrom nonetheless argues that our decision should turn on the statement in the penultimate paragraph of *Stute* that "[i]t is the general contractor's responsibility to furnish safety equipment *or to contractually require subcontractors to furnish adequate safety equipment relevant to their responsibilities.*" 114 Wn.2d at 464 (emphasis added). From this, it argues that the general contractor's duty for WISHA compliance characterized as nondelegable elsewhere in *Stute* can, in fact, be delegated. In proceedings below, the trial court found the quoted statement from *Stute* to be contradictory.[5] The same statement was the basis for the conclusion of the majority in *Degroot* that a subcontractor's contractual undertaking for safety "appears designed to

---

[5] The trial court commented, "[I]f you say there is a non-delegable, well, *Stute* says you can enter into a contract with your subcontractor to deal with the safety issues. Then we have the case law that says it is non-delegable. And I understand what Judge Sweeney is talking about [in *Degroot v. Berkley Constr., Inc.*, 83 Wn. App. 125, 133, 920 P.2d 619 (1996) (Sweeney, C.J., concurring)], because it seems like there is a contradiction here." RP at 2.

meet the duty of care outlined in *Stute*." *Degroot v. Berkley Constr., Inc.*, 83 Wn. App. 125, 129, 920 P.2d 619 (1996).

The statement from *Stute* relied upon by Degerstrom cannot reasonably be read to negate *Stute*'s otherwise clear holding that the general contractor's "primary" "nondelegable" duty is to "ensure compliance" with WISHA, however. Read in the context of the entire opinion, the statement conveys only that a general contractor's efforts to ensure compliance with WISHA may include, and in many cases will necessarily include, requiring subcontractors to comply with WISHA. "The label 'nondelegable duty' does not mean that an actor is not permitted to delegate the activity to an independent contractor. Rather, the term signals that the actor will be vicariously liable for the contractor's tortious conduct in the course of carrying out the activity." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 57 cmt. b (2012). Stated differently, "a 'non-delegable duty' requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted." RESTATEMENT (SECOND) ch. 15, topic 2 introductory note. Here, the quotation from *Stute* supports the fact that Degerstrom could enter into its agreement with Sharp-Line and rely on Sharp-Line's *compliance* with WISHA regulations as satisfying its own duty—not that it could discharge its primary responsibility for WISHA compliance by the mere act of entering into the agreement.

16

We review a trial court's evidentiary rulings for an abuse of discretion. A trial court abuses its discretion if its evidentiary ruling is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. Here, the trial court recognized that Degerstrom had previously advanced a legal position as to the duty of a general contractor that was questionable and it recognized that legal duty should be a matter of instruction. It nonetheless denied the motion in limine. The evidence on duty that Degerstrom chose to offer after the motion was denied did not tend to "make the existence of any *fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401 (emphasis added). More importantly, Degerstrom's evidence and argument that the contract effectively shifted the duty it owed Mr. Lafayette from it, to Sharp-Line, was legally wrong and likely misled and confused the jury. *See Degroot*, 83 Wn. App. at 133 (Sweeney, C.J., concurring). The mischaracterization pervaded Degerstrom's presentation and could not be cured by the concluding instructions to the jury.

The denial of the motion in limine was therefore an abuse of discretion and requires reversal of the judgment and remand for a new trial of the estate's claims.

For this reason and the reasons set forth in the unpublished portion of this opinion, we affirm the trial court's dismissal of Ms. Millican's individual claim, reverse the dismissal of the estate's claim, and remand for a new trial consistent with this opinion.

17

APPENDIX

Degerstrom's opening statement included the following preview of the evidence it would thereafter present:

> Now, NA Degerstrom's specialty is earth work. They don't carry specialties in other things like . . . signage and striping on the road. So what did they do? They hired specialty subcontractors who have the equipment and the knowledge to do this installation. . . .
>
>     . . . .
> There's also gonna be a lot of discussion in this case about NA Degerstrom's contract with Sharp-Line. And as I talked to you earlier, there were several subcontractors on this job, and these subcontractors were was [sic] known as specialty subcontractors. They did work that Sharp— excuse me, that NA Degerstrom did not have the expertise to perform. So what they do, typically any sort of job like, this you subcontract it out to those people that are experts in their field. . . .
>
>     . . . .
> Part of their subcontract agreement, Sharp-Line agreed to comply with all laws and regulations that are applicable to their work with regard to what was being performed at the Flowery Trail Road project. And then I'm gonna show you several safety provisions.

RP at 40-46. Degerstrom's lawyer then made a brief reference to jury instructions that would be given at the end of the case addressing what was allowable under Washington law with regard to delegating duties and regard to safety on the work site. She continued:

> [W]hat I'm going to be providing you today are the several contract provisions that discuss safety between Sharp-Line and NA Degerstrom. And I will again, like Mr. Stocker says, I will be showing you that all these provisions are appropriate and allowable under Washington law, and that safety is allowed to be with regard to a specialty subcontractor, NA Degerstrom could delegate those responsibilities.
> And the reason that you're able—the reason it makes sense as far as delegating these responsibilities, again NA Degerstrom is not all knowing and not knowledgeable about everything that's done on this project. It's

18

appropriate, it's standard in the industry that you hire specialty subcontractors who have expertise in their field. So they have expertise with regard to preventing accidents regarding their work, and that's what the contract requested.

They also have—we requested that Sharp-Line be solely responsible for providing protection and safety of its employees, again because it knows what the hazards are with regard to its job. They had the responsibility for final selection of the safety methods and means. That means how to—how that safety would be conducted on the project. And then finally they had the responsibility for doing daily inspections on their own work area and safety equipment because Degerstrom doesn't know what their equipment is, how it's specialized. There's been plenty of testimony today about this auger truck and how it was a very specialized piece of equipment. But NA Degerstrom certainly doesn't know, have the expertise to run, or would even be responsible if they ran it.

Another safety provision talked about the site specific safety plans the accident prevention plan that NA Degerstrom had, in fact, for that project, and how Sharp-Line had to comply with those safety requirements. And finally Sharp-Line agreed that they would have a written safety plan for this project, an accident prevention plan, and any other documents with regard to safety that were required for this project.

You're gonna be hearing testimony from a gentleman by the name of Mike Craig. Now, Mike Craig is the president of Sharp-Line, and he's been the president of Sharp-Line since its inception in 1987. Mr. Craig will be testifying that he signed this contract, and that he understood these contract provisions, and that he understood that Sharp-Line was required to furnish their own safety equipment and perform their work under this contract, and that type of safety equipment also included chocks. You'll also be provided testimony that the provisions with regard to safety that were in the [Degerstrom] contract with Sharp-Line, they are typical and they are standard in the industry because, again, if you're a specialty subcontractor, you're the one who's gonna know your equipment and know how to safely operate it.

RP at 46-48. Later in opening statement, Degerstrom's lawyer told the jury:

You'll hear how Coit Wright was the employee responsible for the truck that day for Sharp-Line. . . . You'll hear how Mr. Wright was a laborer, that he did not have training on this equipment, that he was not the

19

employee responsible in the operation of this truck. You'll hear how Mr.
Wright made several poor choices that were in contradiction to the training
that he received from Sharp-Line, and that at the end of this workday that
caused that truck to start rolling.

So what did Mr. Wright fail to do? Mr. Wright provided a statement
to the Department of Labor & Industries, and then he also was interviewed
by the Department of Labor & Industries. That information he provided to
the Department of Labor & Industries, you'll hear testimony about. You'll
hear testimony that Mr. Wright failed to set the truck's parking brake.
You'll hear testimony that Mr. Wright failed to turn those wheels into the
downward slope or the shoulder of the road. You'll hear how Mr. Wright
deployed the outriggers, but then for whatever reason brought them back in.

You'll also hear that, although it was not required because the truck
was attended—both Mr. Wright and Mr. Lafayette were there and the
engine was running—that Coit Wright could have used readily available
chocks.

RP at 52-53.

In closing and summarizing the evidence that it had presented, Degerstrom's

lawyer argued:

Now, general contractors, as you know, owe a duty to provide all workers a
safe worksite and to ensure safety regulations are complied with. Now
Degerstrom, in no way, disputes this. . . .

. . . [O]ne of the ways that Degerstrom and all general contractors
ensure a safe worksite is they have their subcontractors—they have their
subcontractors, under contract, furnish the safety equipment. And why is
that? There's been a lot of discussion. Because subcontractors are the
experts in their field, not Degerstrom. They're the ones who know what the
hazards are. They're using their equipment, they know what is hazardous
and how to protect their employees. Degerstrom's duty is analogous to a
forest. Think of the project as being a forest and think of the subcontractors
being the trees in that forest. And the subcontractors being responsible for
the leaves on those trees, their equipment, their workers, all the things in
order to do their job safely as it's contractually required that they do. Now,
a general contractor is not able to see all those trees in the forest at one

20

time. Nor can it see any of the leaves at any given moment. But it's the subcontractors that have agreed to take care of those leaves.

Recall the testimony of Mark Lawless, that was plaintiff's site safety expert. Both he and Mr. Stranne stated it's not reasonable, or industry standard, to expect a general contractor to follow each subcontractor each and every moment to ensure that subcontractors are performing this [sic] jobs safely and correctly. Therefore general contractors are allowed, under the law, to contractually require their subcontractors furnish safety equipment related to their work.

Ladies and gentlemen of the jury, I'm gonna ask that you look at Exhibit D103 and that safety provision that's cited in that contract. And I want you to look, instead of at the second paragraph, look at that first paragraph on that page, because that talks about the safety requirements and that Sharp-Line was solely responsible for the protection and safety of its employees, for the final selection of additional safety means and methods, and for daily inspection of its work area and safety equipment. It specifically says safety equipment. And as you know from the testimony of Mr. Craig, they agreed to be solely responsible for these items. And all witnesses in this case, from Mr. Craig to Mr. Stranne to Mr. Lawless, all testified this is a typical provision in a subcontract agreement.

RP at 845-47.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

### *Denial of the estate's motion for judgment on liability as a matter of law.*

The estate seeks more on appeal than reversal and remand; it asks that we find that the trial court should have granted its posttrial motion for a new trial. The new trial it sought, though, would be limited to damages—the estate wanted the court to instruct the jury that Degerstrom was negligent and its negligence was a proximate cause of Mr.

21

Lafayette's death. On appeal, it characterizes its posttrial motion as implicitly one for judgment as a matter of law on the issue of liability. It argues that the court erred in denying it.

The estate did not move for judgment as a matter of law at the close of the evidence as contemplated by CR 50(b). In authorizing *postverdict* motions for judgment as a matter of law, CR 50(b) speaks only of renewing an equivalent motion made under CR 50(a) before the case was submitted to the jury. The estate argues that it was excused from moving for the relief at the close of the evidence, however, because the motion would have been futile in light of the trial court's denial of its motion in limine. It cites *Kaplan v. N.W. Mut. Life Ins. Co.*, 115 Wn. App. 791, 804 n.6, 65 P.3d 16 (2003) in support.

Degerstrom's response makes a one-sentence mention of the estate's alleged waiver of its right to move for judgment as a matter of law. Br. of Resp't at 6. But it does not dispute the estate's argument that its posttrial motion was implicitly a CR 50(b) motion or provide any authority or argument in opposition to the estate's claimed excuse of futility. Absent any authority or argument in opposition, we assume without deciding that the estate's posttrial motion was, in part, a motion for judgment as a matter of law and that its failure to move for such relief at the close of the evidence is excused. See RAP 10.3(a)(6) and (b) (a respondent's brief, like the appellant's, must include argument on the issues presented for decision along with citations to legal authority).

22

Citing *Pudmaroff v. Allen*, 138 Wn.2d 55, 68, 977 P.2d 574 (1999), the estate contends that while violation of a controlling statute or regulation is not negligence per se, evidence of such a violation can be conclusive if the violator fails to present any evidence of excuse or justification. It argues that it presented evidence of WISHA violations for which Degerstrom presented no excuse or justification. It focuses on regulations imposing a requirement to chock a vehicle's tires in certain situations because, it argues, "there is no dispute that the auger truck would never have rolled away had the wheels been chocked." Br. of Appellant at 31. If a requirement for chocking was breached it argues that the "breach was, as a matter of law, a proximate cause of [Mr.] Lafayette's death." *Id.*

The principal WISHA regulation that Degerstrom alleges was not enforced is WAC 296-155-610(2)(b) (entitled "Motor Vehicles on Construction Sites"), which provides:

> (b) Before leaving a motor vehicle unattended:
> (i) The motor must be stopped.
> (ii) The parking brake must be engaged and the wheels turned into curb or berm when parked on an incline.
> (iii) If parking on an incline and there is no curb or berm, the wheels must be chocked or otherwise secured.

Citing evidence that Degerstrom did not require Sharp-Line to use chocks and did not inspect Sharp-Line's vehicles for chock usage, the estate contends that Degerstrom undisputedly violated this WISHA regulation.

23

Degerstrom's position at trial and on appeal is that the auger truck in which Mr. Lafayette died was not "unattended" and therefore the regulation did not apply.

Degerstrom's first argument that the truck was not unattended before beginning to roll down the incline is a logically fallacious one: Degerstrom argues that "[t]he Washington Administrative Code requires a vehicle's motor to be stopped in order for it to be considered 'unattended.'" Br. of Resp't at 38 (footnote omitted). It infers this proposition from the regulatory language, "Before leaving a motor vehicle unattended: (i) The motor must be stopped." Its construction misconstrues this language as saying something about what makes a motor vehicle "unattended," when it is instead saying something about what operators are required to do when they *leave* a motor vehicle unattended. Were Degerstrom's construction correct, then the WAC would also require a vehicle's parking brake to be engaged for it to be considered "unattended." For that matter, the wheels would have to be turned into a curb or berm when parked on an incline for it to be considered "unattended." And a motor vehicle left remotely overnight, with no operator anywhere in the vicinity, would be considered "attended," rather than "unattended," as long as its motor was running, the parking brake was engaged, or its wheels were turned into a curb or berm and it was parked on an incline. Clearly the regulation is not describing what makes a vehicle "unattended" but only the safety measures that must be taken when it is left unattended.

Elsewhere, Degerstrom's position that a vehicle's motor must be stopped in order for it to be considered "unattended" appears to be based on the fact that the auger and tamper used by Mr. Lafayette and his supervisor were operated using a power take-off (PTO) from the truck's transmission, requiring that the motor be running. Degerstrom considers it obvious that "unattended" cannot include times when the operator of a truck has stepped outside of its cab to operate a PTO-powered piece of equipment. But WISHA regulations are construed liberally to achieve their purpose of providing safe working conditions. *Potelco, Inc. v. Dep't of Labor & Indus.*, 166 Wn. App. 647, 653, 272 P.3d 262 (2012). It is not obvious that the Department of Labor and Industries would be unconcerned that the motor was running, the cab was unattended, and the only potential operators in the vicinity of this truck (pointed downhill), were engaged in other work that could distract their attention or prevent them from reaching the cab in the event of some hazard. The department might well require that a vehicle in this situation be attended by an employee in the cab or one who was not engaged in operating PTO equipment. What we do know from the record (although the evidence appears not to have been admitted at trial) was that the department did cite Sharp-Line for a violation of WAC 296-155-610(2)(b).

The meaning of "unattended" that Degerstrom urges is unambiguous (parked, with the motor stopped, and the operators no longer in the vicinity) is contrary to any meaning

25

attached to the term under OSHA.[6] In interpreting our WISHA regulations in the absence of state decisions, we may look to OSHA regulations and consistent federal decisions. *Wash. Cedar & Supply Co. v. Dep't of Labor & Indus.*, 137 Wn. App. 592, 604, 154 P.3d 287 (2007) (citing *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 147, 750 P.2d 1257, 756 P.2d 142 (1988)). OSHA's construction of "unattended" has not been uniform, varies depending upon the context, and recognizes that a vehicle that is left running may be considered "unattended." *See, e.g.*, 29 C.F.R. 1910.178(m)(5); Letter from Russell B. Swanson, Director, Directorate of Construction, to Peter Kuchinsky II, Safety Trainer/Consultant, Construction Building Analysts (May 11, 2005), *available at* http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIO NS&p_id=25067; Letter from Russell B. Swanson, Director, Directorate of Construction, to Paul Hayes, Safety Manager, Skanska (Jan. 14, 2004), *available at* http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIO NS&p_id=24723 (stating that "when [a construction vehicle is] *left unattended and running*, the parking brake must be set, and if the vehicle is on an incline, in addition to setting the brake, the wheels must be chocked" (emphasis added)).[7]

---

[6] Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678.

[7] Although only briefly reviewed, OSHA regulations include a definition and requirements for industrial trucks used in general industry (not construction):
   (ii) A powered industrial truck is unattended when the operator is 25 ft. or more away from the vehicle which remains in his view, or whenever

No. 30185-1-III
*Millican v. N.A. Degerstrom, Inc.*

The estate argues for the first time in its reply brief that "[w]hether a safety regulation applies on a particular job site is a question of law for the court." Reply Br. at 20 (citing *Manson v. Foutch-Miller*, 38 Wn. App. 898, 902, 691 P.2d 236 (1984)); *see also Ball v. Smith*, 87 Wn.2d 717, 722-25, 556 P.2d 936 (1976) (it is the province of the trial court, not an expert witness, to interpret a statute or ordinance and determine whether it applies to a party). Its argument that the trial court should have determined whether WAC 296-155-610(2)(b) applied, or at least instructed the jury on a meaning for "unattended," appears worthy of briefing and consideration in the retrial. We will not consider it in this appeal, however, for two reasons: it was not raised in the trial court and

---

the operator leaves the vehicle and it is not in his view.

(iii) When the operator of an industrial truck is dismounted and within 25 ft. of the truck still in his view, the load engaging means shall be fully lowered, controls neutralized, and the brakes set to prevent movement.

29 C.F.R. 1910.178(m)(5). In a May 11, 2005 interpretation letter addressed to Peter Kuchinsky II, OSHA referred to this industrial truck regulation in addressing a question about construction equipment, stating:

Although these provisions do not apply to construction or earth-moving equipment, they address some of the same type of hazards. After considering the approach that was taken in §1910.178(m)(5) and the hazards associated with construction equipment, we have determined that, for construction equipment such as bobcats, backhoes, and trenchers, leaving the motor running with the operator away from the controls will be considered a *de minimis* violation of §1926.600(a)(3) where all of the following are met: the attachment is lowered, the controls are in the neutral position, the brakes are set, all manufacturer provided and recommended safety measures are utilized, and the operator is within 25 feet (and still in view) of the equipment.

Letter to Paul Kuchinsky II, *supra* (footnote omitted).

was raised for the first time in the estate's reply brief. RAP 2.5(a) (appellate courts need not entertain issues not raised in the trial court); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (issue raised for the first time in a reply brief is too late to warrant consideration).

In the trial court, the estate was content to have the jury decide whether the regulation applied. While we reject the two principal arguments Degerstrom offers on appeal as to why its construction of the regulation is correct, the fact remains that the estate allowed the meaning and application of the regulation to be decided by the jury. Both parties' witnesses offered their views as to whether the auger truck was "unattended" when the auger was being operated; the estate's witnesses said that it was unattended and Degerstrom's witnesses testified that it was attended, not unattended. As the case was tried, and viewed in the light most favorable to Degerstrom, the evidence could support a jury determination that the auger truck was not unattended at the time it began rolling down the incline. *Cf. Wieder v. Towmotor Corp.*, 568 F. Supp. 1058, 1063 (E.D. Pa. 1983) (experts' conflicting opinions as to whether forklift was left "unattended" when driver dismounted were submitted to the jury for its determination), *aff'd*, 734 F.2d 9 (3d Cir. 1984).

While placing principal reliance on WAC 296-155-610(2)(b), the estate points to evidence it presented of other alleged violations of WISHA regulations by Degerstrom as well. But that evidence was similarly disputed by Degerstrom's employees and experts at

28

trial. And with respect to some of the WISHA regulations the estate argued were violated by Degerstrom, the estate did not conclusively demonstrate that any violation was a proximate cause of Mr. Lafayette's death.

The trial court did not err in denying the estate's motion for judgment as a matter of law on liability and a new trial limited to the issue of damages.

*Refusal to instruct on a duty owed to the public.*

The estate next appeals the trial court's refusal to instruct the jury that the general contractor on a highway construction project has a duty to exercise ordinary care to protect the traveling public from dangerous conditions that may arise within a construction zone. It claims to have relied on an alternative theory of liability that Degerstrom's negligent omissions created a peril to the motorists on Flowery Trail Road who were in the path of the auger truck as it rolled downhill. Its breach of that duty owed the public created liability to anyone injured in a reasonable attempt to rescue the imperiled motorists—in this case, the rescuer happened to be the employee of a subcontractor. *See McCoy v. Am. Suzuki Motor Corp.*, 136 Wn.2d 350, 355, 961 P.2d 952 (1998) (rescue doctrine[8] allows an injured rescuer to sue the party that caused the

---

[8] A plaintiff relying on the rescue doctrine must prove that (1) the defendant was negligent to the person rescued and that negligence created an appearance that the person rescued was in peril, (2) the peril or appearance of peril was imminent, (3) a reasonably prudent person would have concluded that the peril existed, and (4) the rescuer acted with reasonable care. *McCoy*, 136 Wn.2d at 355-56.

danger that required the rescue). It contends that the court's refusal to give the requested instruction prevented it from arguing this separate theory of negligence.

Jury instructions must allow the parties to argue their theories of the case, must not mislead the jury, and must as a whole inform the jury of the applicable law. *Thompson v. King Feed & Nutrition Serv., Inc.*, 153 Wn.2d 447, 453, 105 P.3d 378 (2005). "Failure to permit instructions on a party's theory of the case, where there is evidence supporting the theory, is reversible error." *Barrett v. Lucky Seven Saloon, Inc.*, 152 Wn.2d 259, 266-67, 96 P.3d 386 (2004). "As with a trial court's instruction misstating the applicable law, a court's omission of a proposed statement of the governing law will be 'reversible error where it prejudices a party.'" *Id.* at 267 (quoting *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995)). On appeal, errors of law in jury instructions are reviewed de novo. *Hue*, 127 Wn.2d at 92.

The estate's proposed instruction was not a Washington pattern jury instruction; the authority it cited in proposing the instruction was *Smith v. Acme Paving Co.*, 16 Wn. App. 389, 558 P.2d 811 (1976) and *Cummins v. Rachner*, 257 N.W.2d 808 (Minn. 1977). On appeal, it cites *Argus v. Peter Kiewit Sons' Co.*, 49 Wn.2d 853, 307 P.2d 261 (1957) as additional authority. Degerstrom argues that all three cases involved distinguishable facts: a contractor engaged in road construction who created a hazard in or on the physical roadway being constructed. We agree; the duty of the contractor in each case was identified as being to maintain the streets in a reasonably safe condition and to guard

drivers from reasonably anticipated hazards. *Argus*, 49 Wn.2d at 856; *Smith*, 16 Wn. App. at 393; *Cummins*, 257 N.W.2d at 813. As stated in *Smith*, 16 Wn. App. at 393-94, this duty "is particularly applicable where the conditions complained of arise out of the actual construction, repair, and maintenance of the roadway." Degerstrom is not accused of creating a hazard, but of failing to safeguard against it.

Nonetheless, other evidence presented at trial supported a broader duty owed by Degerstrom to the public. Degerstrom's agreement in its accident prevention program to reasonably ensure that parked, unattended vehicles were chocked on inclines apparently was intended to protect the public as well as employees from hazardous runaway vehicles. The reference in WISHA regulations to vehicles parked at night, after work hours, proves this intent. WAC 296-155-605(1)(a). Degerstrom also agreed to safeguard the public from its operations and to provide adequate warnings of hazards for workers and the public.

This scope of Degerstrom's duty was reflected in other instructions given by the trial court, however, from which the estate could argue that Degerstrom breached a duty of care to the public by failing to require Sharp-Line to use chocks on the auger trucks. The trial court's instructions informed the jury that negligence includes "the failure to do some act that a reasonably careful person would have done under the same or similar circumstances," CP at 3179, and that a violation of a WISHA regulation is evidence of negligence. The estate elicited testimony from several witnesses that it would have been

31

safer to use chocks under the circumstances of the accident, and argued that the failure to use chocks was both unreasonable and a violation of WISHA safety regulations, creating an imminent threat to the public.

The instructions given enabled the estate to argue a negligent breach of duty to the public. The trial court's refusal to give a more specific instruction was therefore not reversible error.

### *Dismissal of Ms. Millican's individual claim.*

Ms. Millican sued not only as the personal representative of Mr. Lafayette's estate but also individually, as a statutory beneficiary. RCW 4.20.020 identifies a first and second tier of beneficiaries who may recover damages for wrongful death. *Armantrout v. Carlson*, 166 Wn.2d 931, 935, 214 P.3d 914 (2009). The first tier includes a decedent's wife, husband, or registered domestic partner, and any children or stepchildren. If there are no first tier beneficiaries, as in the case of 19-year-old Mr. Lafayette, a wrongful death suit may be maintained for the benefit of second tier beneficiaries, including parents or siblings "who may be dependent upon the deceased person for support." RCW 4.20.020; *Armantrout*, 166 Wn.2d at 935.

The statute does not define "dependent" or "support." It has long been construed to require that second tier beneficiaries prove "'substantial dependency'" and a recognition by the child of the parent's "'necessitous want.'" *Id.* at 936 (quoting *Bortle v. N. Pac. Ry.*, 60 Wash. 552, 554, 111 P. 788 (1910)). The substantial dependency must

be based on the situation existing at the time of the decedent's death, not on a promise of future contributions. *Id.* Emotional dependency alone will not qualify parents for second-tier beneficiary status. *Id.* In *Armantrout*, the Washington Supreme Court held that the trier of fact may consider services provided by the deceased that had a monetary value for which the parents would not otherwise have been able to pay. It may not, however, consider "everyday services a child would routinely provide." *Id.* at 940.

The defendants moved for summary judgment dismissing Ms. Millican's individual claim, arguing that there was no genuine issue that she was dependent on her son for support. It was undisputed that Mr. Lafayette had moved out of his mother's home four months before the accident and had been living independently. The defendants submitted Ms. Millican's deposition in support of their motion, summarizing material concessions made in the deposition as follows:

> Mrs. Millican does not have debilitating health problems requiring necessary care and assistance from her family members. She had a pulmonary embolism nearly twenty years ago and now has hypertension, but she tries not to limit herself in activities. Mr. Lafayette did not offer any medical care to his mother. In fact, Ms. Millican is able to work at two jobs, the Riverside school district administration office and a foster home for at-risk youth. Currently, she is working about 35 hours per week at the school district and 35-40 hours per week at the foster home. Mr. Lafayette did not give his mother any [monetary] support.

CP at 645-46 (footnotes omitted).

In response, Ms. Millican submitted the declaration of her primary care physician that she has class IV pulmonary hypertension that causes shortness of breath with

exertion and significantly limits her ability to do chores involving aerobic activity. She also submitted evidence that her son began working construction at age 12 and had become proficient at construction, household repair, and landscaping. She testified that during his teenage years he had regularly handled household repairs and maintenance and had undertaken a number of improvements to her home and the 10-acre parcel on which it is located. She argued that her physical limitations prevented her, personally, from performing the maintenance required on her home and property.

She testified that her son planned to continue providing these and other maintenance, repair, and home improvement services in the future. In support of a motion for reconsideration she submitted a declaration stating conclusorily that she and her husband were financially unable to pay someone else to perform the tasks necessary for the maintenance and upkeep of their home. Because she and her husband could not keep up the property as well as Mr. Lafayette had, and it did not make sense for her to refinance a home that was losing value, she testified that she lost her home in foreclosure.

Our review of an order of summary judgment is de novo, considering the facts and reasonable inferences in the light most favorable to the nonmoving party. *Beggs v. Dep't of Soc. & Health Servs.*, 171 Wn.2d 69, 75, 247 P.3d 421 (2011); *Right-Price Recreation, LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 381, 46 P.3d 789 (2002). Summary judgment is proper if the pleadings and accompanying documentary evidence show that there is no genuine issue of material fact and that the moving party is entitled

to judgment as a matter of law. *Phillips v. King County*, 136 Wn.2d 946, 956, 968 P.2d 871 (1998); CR 56(c).

Viewing the evidence in the light most favorable to Ms. Millican, the services Mr. Lafayette provided are different from the type of support services discussed in *Armantrout* that make a parent "dependent . . . for support" within the meaning of RCW 4.20.020. In that case, the 18-year-old decedent had lived with her mother, who had diabetes and was blind. She acted as her mother's driver and administered her mother's glucose tests and insulin injections. The decedent had contributed her monthly disability benefit checks to the household. *Armantrout* held that these services were the kind for which an economic value could be determined. At the same time, it endorsed the trial court's instruction to the jury that the financial dependence required excluded the everyday services a child would routinely provide. 166 Wn.2d at 939.

Ms. Millican's evidence responding to the summary judgment motion failed to demonstrate a genuine issue of material fact. Mr. Lafayette provided no medical care or monetary support to his mother, who was able to get around on her own and hold more than full-time employment. Some services provided by Mr. Lafayette, such as snow plowing and yard maintenance, were in the nature of everyday services a child would routinely provide. Extensive future home and landscaping improvements accounted for a

No. 30185-1-III
*Millican v. N.A. Degerstrom, Inc.*

large part of her damage claim[9] but they were both hoped-for contributions and not the degree of dependency contemplated by the statute, which "must be real and substantial and will not arise from occasional gifts or gratuities." *Beggs*, 171 Wn.2d at 82 n.12. Finally, with respect to any assistance she had been receiving from Mr. Lafayette that Ms. Millican might legitimately argue was nonroutine and responded to a real and substantial need, she made no showing of financial dependence on that assistance.

The trial court properly granted the defendants' motion for partial summary judgment dismissing Ms. Millican's individual claim.

We affirm the trial court's dismissal of Ms. Millican's individual claim, reverse the dismissal of the estate's claim, and remand for a new trial consistent with this opinion.

Siddoway, A.C.J.

I CONCUR:

Kulik, J.

---

[9] Summarized at CP 782-87, Ms. Millican's damage claim included the value of the following improvements to her home that she had hoped Mr. Lafayette would undertake in the future: construction of a new two-car garage with studio apartment; a two-story addition to the home; a kitchen remodel; and new lawn, sprinkler, and drip irrigation systems.

No. 30185-1-III

BROWN, J., (concurring in part, dissenting in part) — I agree the trial court correctly dismissed Dorothy Millican's individual claim. But in my view under existing law, the trial court did not abuse its discretion and err in admitting the subcontract between N.A. Degerstrom (NAD) and Sharp-Line Industries, Inc. Pretrial, the Estate of Daren Lafayette (Estate) unsuccessfully moved to exclude any "[a]rgument or inference that Degerstrom did not retain control or exercise supervision over [Sharp-Line's] work," citing ER 401, 402, and 403 and *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 788 P.2d 545 (1990). Clerk's Papers (CP) at 1549. Attached to the motion was the subcontract between NAD and Sharp-Line, which specified in one provision that Sharp-Line

> accepts responsibility to prevent accidents to any person who may be close enough to its operations to be exposed to Subcontractor's work-related hazards. Subcontractor shall be solely responsible for the protection and safety of its employees, for final selection of additional safety methods and means, and for daily inspection of its work area and safety equipment.

CP at 3227. The Estate mistakenly contends this provision impermissibly delegated NAD's responsibility to ensure compliance with the safety regulations of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW.

Evidence must be relevant to be admissible, meaning "it must tend to make the existence of any fact of consequence to the action more or less probable." *Degroot v. Berkley Constr., Inc.*, 83 Wn. App. 125, 128, 920 P.2d 619 (1996). Even relevant evidence may be excluded if its probative value is outweighed by the likelihood that it will mislead the jury. *Id.* The trial court's balancing of probative value versus prejudicial effect is entitled to great deference. *Id.*

The subcontract's safety provision was relevant to NAD's defense that it took all reasonable steps to comply with WISHA regulations. Under RCW 49.17.060, each employer

> (1) Shall furnish to each of his or her employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to his or her employees . . . ; and
> (2) Shall comply with the rules, regulations, and orders promulgated under this chapter.

This statute is mirrored in WAC 296-155-040, which states in part:

> (1) Each employer shall furnish to each employee a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to employees.
> (2) Every employer shall require safety devices, furnish safeguards, and shall adopt and use practices, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe. Every employer shall do everything reasonably necessary to protect the life and safety of employees.

*See Stute*, 114 Wn.2d at 457, 459-60. *Stute* held RCW 49.17.060 and WAC 291-155-040 create a two-fold duty for general contractors. *Id.* at 457. Subsection (1) of the statute and regulation imposes a general duty on employers to protect solely their own employees from "recognized hazards not covered by specific safety regulations." *Id.*

2

Subsection (2) of the statute and regulation, however, "imposes a specific duty to comply with WISHA regulations." *Id.* This specific duty extends to the employees of subcontractors. *Id.* at 458. Thus, a general contractor has a nondelegable duty to ensure compliance with safety regulations for the safety of a subcontractor's employees. *Id.* at 463-64.

In *Stute*, P.B.M.C., Inc., a general contractor, subcontracted with S & S Gutters to install gutters on a condominium complex. Mr. Stute, an employee of S & S Gutters, fell while installing gutters and was injured. The record showed P.B.M.C. knew the employees of S & S Gutters were working on the roof without safety devices. *Id.* at 456. Mr. Stute sued P.B.M.C., alleging the general contractor owed a duty to provide necessary safety devices on the work site. Citing RCW 49.17.060, WAC 296-155-040, and the general contractor's "innate supervisory authority," *Stute*, 114 Wn.2d at 464, the Supreme Court held a general contractor had a specific duty as a matter of law to supply safety equipment for all employees on a work site or to contractually require subcontractors to provide adequate safety equipment relevant to their responsibilities. *Stute*, 114 Wn.2d at 464.

Here, the trial court correctly reasoned *Stute* allowed a general contractor to contractually require subcontractors to furnish adequate safety equipment. *Id.* Thus, in my view, the trial court correctly admitted the subcontract with the understanding it would deal with the legal issues in the jury instructions.

3

In *Degroot*, a subcontractor's employee was injured while working on a job site and sued the general contractors for negligence and WISHA violations. Before trial, the employee moved to exclude a subcontract safety provision that arguably gave the subcontractor sole responsibility for the safety of its employees:

> "Subcontractor shall, at its own cost and expense, protect its own employees, employees of Contractor, and all other persons from risk of death, injury or bodily harm arising out of or in any way connected with the work to be performed under this Subcontract.
> "Subcontractor shall strictly comply with all safety orders, rules, regulations or requirements of all federal, state and local government agencies, exercising safety jurisdiction over said work including, but not limited to, federal OSHA [Occupational Safey and Health Act of 1970, 29 U.S.C. §§ 651-678] and state occupational safety and health regulations."

*Degroot*, 83 Wn. App. at 128. The employee contended that because the safety provision gave the impression that the general contractors had delegated to the subcontractor the duty to furnish a relatively safe working environment, the safety provision was irrelevant and misleading. *Id.* at 127.

In affirming the trial court's admission of the evidence, the *Degroot* court found the boilerplate language in the safety provision appeared to be designed to meet the duty of care outlined in *Stute*, particularly the general contractor's duty to "'furnish safety equipment or to contractually require subcontractors to furnish adequate safety equipment.'" *Id.* at 129 (quoting *Stute*, 114 Wn.2d at 464). Consequently, the safety provision was "at least relevant to whether [the general contractors] fulfilled their WISHA responsibility for the safety of all employees on the work site." *Id.* The *Degroot* court concluded the safety provision was not misleading, because the general contractors

4

agreed at trial they had a nondelegable duty to comply with WISHA safety regulations, never argued the subcontract delegated this duty to the subcontractor, and submitted the safety provision solely as "evidence of their attempt to exercise reasonable care to enforce safety regulations on the work site." *Id.* at 131. The trial court in *Degroot* instructed the jury that the provision was not evidence that the general contractors had delegated their WISHA duties to the subcontractor and that the general contractors were required to exercise ordinary care to ensure compliance with safety regulations on the work site. *Id.*

Under *Degroot*, subcontract safety provisions may be admissible as evidence of the steps the general contractor took to comply with WISHA safety regulations, but the provisions are not admissible to show the general contractor delegated its responsibility for compliance with the safety regulations to the subcontractor. *Id.* at 129. As in *Degroot*, the subcontract safety provision here is relevant to whether NAD met its duty to ensure compliance with WISHA safety regulations at the work site. *Id.*; *Stute*, 114 Wn.2d at 464; WAC 296-155-040(2).

The trial court found the relevance of the subcontract safety provision here outweighed the possibility that it might mislead the jury regarding the general contractor's nondelegable duty to comply with WISHA safety regulations. Although the subcontract states Sharp-Line is "solely responsible for the protection and safety of its employees," CP at 3227, NAD acknowledged in its opening and closing statements that

5

general contractors have a legal duty to provide a safe work site for all employees. No objection was noted to NAD's arguments in the briefing.

In terms of a fair trial, NAD employees testified that the general contractor retained the ultimate responsibility for work site safety. Additionally, NAD provided evidence it had a site specific accident prevention plan, it had a foreman and superintendent performing oversight at the job site daily, as well as a safety director who checked in on occasion, and it ran weekly safety meetings that were required for all workers on the site. NAD's closing statement explained that as the general contractor, it was required to take reasonable steps to ensure the safety of the work site, including contractually requiring its subcontractors to furnish any safety equipment related to their work. The trial court was in the best position to rule on any objections, if they had been made.

Importantly, the jury was instructed that a general contractor has a nondelegable responsibility to ensure the safety of all employees on the work site:

> Under Washington law, a general contractor on a construction project owes a duty to every employee at the job site, including employees of subcontractors, to ensure that it and its subcontractors comply with all applicable safety regulations. The general contractor is the party with innate supervisory authority and per se control over the job site, so it bears the primary, non-delegable duty to provide a safe workplace for subcontractor employees.
> In Washington, all general contractors have a non-delegable specific duty to ensure compliance with all Washington state construction safety regulations.

CP at 3182. We assume juries follow the instructions. *Degroot*, 83 Wn. App. at 131.

6

Accordingly, I concur in affirming the trial court's dismissal of Ms. Millican's individual claim, but because I would affirm the trial court's judgment on the jury's verdict, I respectfully dissent.

Brown, J.