# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

| | | |
|---|---|---|
| BRANDON APELA AFOA, | ) | No. 75951-5-I |
| | ) | |
| Respondent/Cross Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PORT OF SEATTLE, a local | ) | |
| governmental entity in the state | ) | PUBLISHED OPINION |
| of Washington, | ) | |
| | ) | FILED: March 20, 2017 |
| Appellant/Cross Respondent. | ) | |
| | ) | |

VERELLEN, C.J. — Brandon Afoa was severely injured working for Evergreen Aviation Ground Logistics Enterprises, Inc. (EAGLE), providing ground services at Seattle-Tacoma International Airport (Sea-Tac Airport), which is owned and operated by the Port of Seattle (Port). Afoa sued the Port, alleging it failed to maintain safe premises and violated common law and statutory duties to maintain a safe workplace. The trial court dismissed Afoa's claims on summary judgment, but this court reversed, and our Supreme Court affirmed the reversal of summary judgment.[1] On remand, a jury rendered a verdict in favor of Afoa and determined his damages totaled $40 million. The jury allocated 25 percent fault to the Port and 18.7 percent fault to each of the four nonparty airlines that used EAGLE's ground services. The trial court entered a

---

[1] Afoa v. Port of Seattle, 176 Wn.2d 460, 482, 296 P.3d 800 (2013) (Afoa I).

judgment against the Port for $10 million.

The Port appeals, focusing on the disjunctive phrasing of special verdict form question 1, which asked the jury whether the Port retained a right to control the manner in which EAGLE "performed its work or maintained its equipment used to provide ground work support . . .?"[2] Because both the common law theory of retained control and the Washington Industrial Safety and Health Act of 1973 (WISHA)[3] "specific duty" standard depend on control over the "manner of work" done on a work site, which necessarily encompasses control over the maintenance of instrumentalities used in performing that work, the special verdict did not misstate the law. While the special verdict should have used terms consistent with the other instructions, no relief is warranted because the Port was able to adequately argue its theory. The Port's other claims also fail.

Afoa cross appeals, arguing that the jury should have been precluded from allocating fault to the four airlines because the Port had a nondelegable duty to maintain a safe workplace. We conclude the Port had a nondelegable duty to ensure a safe workplace, including safe equipment, and is vicariously liable for any breach of that duty. Consistent with the Port's vicarious liability, it is not entitled to allocate fault to the four nonparty airlines and proportionately reduce its liability.

Therefore, we affirm the jury verdict as to the liability of the Port and remand for entry of an amended judgment.

---

[2] Clerk's Papers (CP) at 4839.
[3] Ch. 49.17 RCW.

2

## FACTS

### A. Afoa I

Brandon Afoa was severely injured in 2007 as a result of a collision while he was driving a "pushback" vehicle on the airplane ramp at Sea-Tac Airport. Afoa worked for EAGLE, which contracts with airlines to provide ground services such as moving aircraft in the ramp area. The Port owns and operates the airport. It does not employ EAGLE or contract for its services, but EAGLE must obtain a license from the Port before it can work on the premises. As Afoa drove the pushback toward gate S-16, he lost control of the vehicle and crashed into a large piece of loading equipment that fell on him, leaving him paralyzed.

Afoa sued the Port in February 2009, alleging it "failed to maintain safe premises and violated common law and statutory duties to maintain a safe workplace."[4] The Port moved for summary judgment, arguing none of Afoa's claims were viable because neither Afoa nor EAGLE was the Port's employee. The trial court granted the Port's motion, dismissing Afoa's claims. This court reversed, holding that Afoa's claims hinged on genuine issues of material fact and that summary judgment was inappropriate.[5] The Supreme Court granted review and affirmed this court's reversal of summary judgment, remanding the case to the trial court.[6]

---

[4] Afoa I, 176 Wn.2d at 465.

[5] Afoa v. Port of Seattle, 160 Wn. App. 234, 237, 244, 247 P.3d 482 (2011).

[6] Afoa I, 176 Wn.2d at 482.

### B. Afoa v. China Airlines, Hawaiian Airlines, British Airways, and Eva Air

Afoa's prior appeal against the Port lasted over three years. In December 2010, during the pendency of the appeal, Afoa filed a "precautionary"[7] lawsuit against four airlines that used EAGLE's ground services. Ultimately, that lawsuit was removed to federal court, stayed pending Afoa I, and then dismissed after the federal court denied Afoa's motion to add the Port. The federal court concluded that Afoa failed to show the airlines were at fault and granted the airlines summary judgment in February and June 2014.

### C. Afoa v. Port of Seattle

The Afoa I mandate issued February 27, 2013. On September 19, 2014, the Port moved to amend its affirmative defenses to identify the four airlines as potential nonparties at fault for purposes of RCW 4.22.070(1). Afoa opposed allocating fault to the airlines, arguing the Port's failure to amend earlier "made it impossible for Mr. Afoa to bring claims against the Airlines in the same action."[8] But the trial court found this was "the consequence of Afoa's litigation choices (including the decision to sue the Port and the Airlines separately)."[9] The court permitted the Port to amend its answer.

At trial, Afoa presented evidence of the Port's control over Sea-Tac's airfield, where any activity is "subject at all times to the exclusive control and management by

---

[7] Resp't's Br. at 59.
[8] CP at 8062.
[9] CP at 3176.

the Port."[10] Sea-Tac's airfield is divided into two parts, the "movement" and "nonmovement" areas.[11] While the Port and Federal Aviation Administration (FAA) share control over the movement area where planes take off, land, and taxi, the Port retains nearly total control over the nonmovement area, which includes the "ramp" where Afoa's injury occurred.[12] These two areas are divided by the "vehicle control line."[13] Different rules and different badges for access apply in the two different areas. The FAA airport tower controls movement in the movement area. The ramp tower, on the other hand, controls all movement on the ramp and is staffed by contractors hired by the Port. Afoa was licensed by the Port to drive exclusively in the ramp area.

Afoa also presented evidence of the Port's control over the manner in which EAGLE performed ground service work through its "Ground Service Operator Licensing Agreement" (Licensing Agreement) with EAGLE, as well as its control over EAGLE's conduct:

- The Licensing Agreement required EAGLE to comply with all Port rules.[14]

- Under EAGLE's Licensing Agreement with the Port, "*[a]s solely determined by the Port, equipment* appearing to be unsafe or unoperational is subject to towing, impoundment and storage charges."[15]

---

[10] Port Exhibit 675 at 277 (China Airlines); Port Exhibit 676 at 3465 (British Airways, PLC); Port Exhibit 677 at 3648 (Eva Airways Corporation); Port Exhibit 678 at 190 (Hawaiian Airlines, Inc.); Report of Proceedings (RP) (Mar. 3, 2015) at 1510.

[11] RP (Feb. 24, 2015) at 695-97; CP at 6500-01.

[12] RP (Feb. 24, 2015) at 695-97; CP at 6500-01.

[13] RP (Feb. 24, 2015) at 706.

[14] Port Ex. 311 ¶9.

[15] Port Ex. 311 ¶11(A) (emphasis added).

- In addition to the Port rules, the airport director was specifically authorized "to issue such other *instructions* as may be deemed necessary for the safety and well-being of [a]irport users or otherwise in the best interests of the Port."[16]

- A Port rule states that *"[n]o person shall operate any . . . motorized equipment in the Air Operations Area*[17] *unless such . . . motorized equipment is in a reasonably safe condition for such operation."*[18] The Port had the authority to "red-tag" or impound any motorized equipment not in compliance so that it would have to be removed and/or repaired before it could be used again.

- EAGLE ramp supervisor Toiva Gaoa gave several examples of how the Port controlled the manner in which he conducted his work. *According* to Gaoa, the Port controls the S gates, near where Afoa's accident happened: "[T]hat's where they enplane all . . . the international flights, so they make a lot of money off of these flights. So . . . it's always a . . . juggling act of moving one aircraft to . . . a gate to accommodate . . . another aircraft. . . . [I]t was like a circus. And the ringmaster was the -- the Port of Seattle, and they make sure that everything was -- was run the way they wanted it. Put this plane here. Take that plane over there. And that's my experience with the . . . S gates is that they control it.[19]

A jury found that the Port controlled the manner of EAGLE's work at Sea-Tac and determined damages totaled $40 million. The jury allocated 25 percent fault to the Port and 18.7 percent fault to each of the nonparty airlines that used EAGLE's ground services.[20] Pursuant to the jury's fault allocation, the trial court entered judgment against the Port for $10 million.

The Port appeals, and Afoa cross appeals.

---

[16] Port Ex. 482 at 51 ¶8.

[17] The "Air Operations Area" (AOA) "is essentially all areas inside the airport perimeter fence where aircraft would operate. Simply, these are all areas with restricted access and located outside the airport terminal buildings." RP (Feb. 24, 2015) at 695.

[18] Port Ex. 482 at 54 ¶15 (emphasis added).

[19] RP (Feb. 23, 2015) at 449.

[20] The jury also assigned 0.20 percent fault to Afoa.

## ANALYSIS

### I. Special Verdict Form Question 1

The Port challenges the trial court's disjunctive phrasing of special verdict form question 1, which asked whether the Port retained "a right to control the manner in which the plaintiff's employer, [EAGLE], performed its work or maintained its equipment used to provide ground support work for the non-party air carriers . . .?"[21] The Port argues this verdict form is based on an incorrect statement of the law[22] and allowed the jury to find the Port liable without finding it had retained the requisite right to control the manner in which EAGLE maintained the pushback.

We review a trial court's decision regarding a special verdict form under the same standard we apply to decisions regarding jury instructions.[23] Whether a jury instruction reflects an accurate statement of law is reviewed de novo.[24] Jury instructions are reviewed in their entirety and are sufficient if they permit each party to argue their theory of the case, are not misleading, and when read as a whole properly inform the jury of the applicable law.[25]

---

[21] CP at 4839 (emphasis added).

[22] Contrary to Afoa's argument that the Port invited error in Question 1's use of the disjunctive "or," the Port proposed an entirely different instruction: "Did the [Port] retain a right to direct the manner in which the plaintiff's employer, [EAGLE], *performed or completed the maintenance of the equipment* used by EAGLE to provide ground support work . . . ?" CP at 4673 (emphasis added).

[23] Canfield v. Clark, 196 Wn. App. 191, 199, 385 P.3d 156 (2016); Capers v. Bon Marche, 91 Wn. App. 138, 142, 955 P.2d 822 (1998)).

[24] Joyce v. Dep't of Corr., 155 Wn.2d 306, 323, 119 P.3d 825 (2005).

[25] Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996); Caldwell v. Washington State Dep't of Transp., 123 Wn. App. 693, 697, 96 P.3d 407 (2004) (quoting Capers, 91 Wn. App. at 142).

a. No Misstatement of the Law

The Port argues that special verdict form question one had to be phrased in the conjunctive. The Port's premise is that control over "manner of work" is a separate and discrete category from control over "maintaining instrumentalities."[26] But the Port misperceives both the common law theory of retained control and the WISHA specific duty standard.

In Kelley v. Howard S. Wright Construction Co., our Supreme Court held that where a principal "retains control *over some part of the work*" completed by a worker at its site, the principal has a duty to maintain safe common workplaces for all workers on the site.[27] The Supreme Court based its holding on the *Restatement (Second) of Torts* § 414 (1965) :

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.[28]

A decade later, in Stute v. P.B.M.C. Inc., our Supreme Court held that WISHA, in particular RCW 49.17.060(2), "imposes a specific duty" for employers "to comply with WISHA regulations."[29] This "specific duty does not create per se liability for anyone deemed an 'employer.'"[30] Rather, jobsite owners have a specific duty to comply with WISHA regulations "only if they retain control *over the manner in which contractors*

---

[26] Resp't's Br. at 10-11.

[27] 90 Wn.2d 323, 330-31, 582 P.2d 500 (1978).

[28] (Emphasis added.)

[29] 114 Wn.2d 454, 457, 788 P.2d 545 (1990).

[30] Afoa I, 176 Wn.2d at 472.

*complete their work.*"[31] In Afoa I, our Supreme Court held, based on Kelley and Stute, that a jobsite owner is only liable for a worker's injuries if it retains but fails to exercise control over the "work done" on a work site.[32]

Both the common law theory of retained control based on the *Restatement* and the WISHA specific duty standard depend on control over the manner of work.[33] Control over the manner of work necessarily encompasses control over the maintenance of instrumentalities used in performing that work. "Manner of work" and "maintaining instrumentalities" are not mutually exclusive categories. Stated another way, a jobsite owner's control over maintaining instrumentalities is merely part of its control over the manner of work being performed on the jobsite.

Although special verdict form question 1 is not a model, it is consistent with the underlying retained control theory of the *Restatement* and the WISHA specific duty standard. The special verdict does not misstate the law.

---

[31] Id. (emphasis added).

[32] Id. at 470 ("Jobsite owners such as the Port have a statutory duty to prevent WISHA violations if they retain control over work done on a jobsite").

[33] See Afoa I, 176 Wn.2d at 477 ("the existence of a safe workplace duty depends on retained control over work"); Kamla v. Space Needle Corp., 147 Wn.2d 114, 121, 52 P.3d 472 (2002) ("When we distill the principles evident in our case law, the proper inquiry [is] whether there is a retention of the right to direct the manner in which the work is performed, not simply whether there is an actual exercise of control over the manner in which the work is performed."); RESTATEMENT (SECOND) OF TORTS § 414 cmt. c ("There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.'"); Stute v. P.B.M.C., Inc., 114 Wn.2d 454, 464, 788 P.2d 545 (1990) (imposing primary responsibility for compliance with WISHA regulations on the general contractor because its "innate supervisory authority constitutes sufficient control over the workplace").

### b. Permitted the Port to Argue Its Theory of the Case

The Port's theory was that control over the manner of work did not trigger common law or WISHA liability, rather, only operational-level control over the actual maintenance of the pushback could trigger such liability.[34] The record from closing argument makes clear that the Port extensively argued this theory.

The Port began closing argument by stating the case was "very simple" because the "only evidence you need . . . for deciding the liability issue is this: If EAGLE had properly maintained its equipment, Mr. Afoa's accident would not have happened."[35] Although the Supreme Court in Afoa I made clear that contractual formalities do not trump Washington courts' "well-established principles of workplace safety,"[36] the Port stressed that EAGLE promised in its licensing agreement with the Port that it would maintain its own equipment: "Had that happened, had EAGLE done its job, had it complied with its contract and its promises, this accident would never have happened."[37]

The Port argued there was not "one single document in this case" that showed the Port retained the right to control how the airlines or ground support providers "do

---

[34] The Port refers to this as its "turning the wrench" theory. See RP (Mar. 12, 2015) at 2286-87 ("The plaintiffs must prove that . . . the Port of Seattle, retained the right to control, direct the means and methods that affected the condition or activity that actually caused the injury. . . . There's no evidence whatsoever that we told them how to turn wrenches, what oil to use, when to . . . view the maintenance inspections."); CP at 1898-99, 4577, 4971.

[35] RP (Mar. 25, 2015) at 3504.

[36] Afoa I, 176 Wn.2d at 478.

[37] RP (Mar. 25, 2015) at 3507, 3514.

their work or maintain their equipment," including under the Port rules.[38] It continued, "The Port does not get involved in ground support performance and how they complete their work or how they maintain their equipment."[39] The Port claimed it was concerned "that the equipment be maintained, . . . but [not] how they maintain it," and that the "exclusive control" provision in each airline's lease agreement "doesn't mean we intend to tell the air carriers how to do their work or maintain their equipment or, likewise, with the ground service equipment."[40]

The Port further argued the airlines had control:

We've heard evidence that the air carriers did, in fact, tell EAGLE how to do its job. . . . They told them how to load [equipment] . . . [and] how to move it. They even told them how to clean their ashtrays. That's control. That's the retention of the right to control, and that's what the air carriers did.[41]

It continued: "[I]f somebody was going to see a problem, it would have been the air carriers. And if they saw, they had a duty to fix it. They had a duty to tell EAGLE to fix that equipment. That's the . . . control they retained."[42] The Port argued to the jury that they must answer "no" to special verdict form question 1 because "the Port did not retain the right to control how the ground support people . . . maintained their equipment, how the air carriers maintained their equipment, how they did their job."[43]

---

[38] Id. at 3512, 3509-10, 3513, 3517, 3520.

[39] Id. at 3513.

[40] Id. at 3514-16.

[41] Id. at 3518.

[42] Id. at 3530-31.

[43] Id. at 3520-21, 3509.

The Port clearly presented its theory of the case to the jury in closing, emphasizing its lack of control over the precise method of maintaining the pushback. Because special verdict form question 1 was not inconsistent with the Port's theory and did not preclude or contradict that theory, we conclude the special verdict adequately allowed the Port to argue its theory.

Further, the Port offers no alternative argument that the instruction, if misleading, caused actual prejudice.[44] It instead relies on the presumptive prejudice for an instruction that incorrectly states the law. Although special verdict form question 1 did not dovetail with other instructions given to the jury,[45] question 1 did not in and of itself misstate the law. While a special verdict form question should use terms consistent with the other instructions, the Port does not establish, or even argue, the special

---

[44] See Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012) ("Prejudice is presumed if the instruction contains a clear misstatement of law; prejudice must be demonstrated if the instruction is merely misleading.").

[45] Instruction 23 stated, "A land owner . . . has a duty to maintain a safe work place at a job site . . . if the landowner retains the right to control the manner *and* instrumentalities by which the work is performed." CP at 4807 (emphasis added).

Instruction 26 stated, "A land owner . . . has a duty to ensure compliance with applicable safety regulations . . . only if the land owner retains the right to control the manner *and* instrumentalities by which the work is performed." CP at 4810 (emphasis added).

Instruction 28 stated, "Authority to inspect work, order it stopped and started, or require contract compliance do not alone constitute retention of the right to control the manner *and* instrumentalities by which a worker . . . ." CP at 4812 (emphasis added).

Instruction 13 included "retained the right to control the manner in which [EAGLE] performed its work and maintained the equipment" and "retained control of the manner in which EAGLE employees performed their work *and* maintained their equipment." CP at 4795 (emphasis added).

Neither party excepted to Instructions 23, 26, or 28. Afoa excepted to instruction 13, but he did not complain about its conjunctive phrasing. RP (Mar. 24, 2015) at 3213-16.

verdict form caused actual prejudice. Accordingly, we conclude the instructions including special verdict question 1 were sufficient.

*II. Substantial Evidence of Required Control*

The Port asserts that because a failure to maintain EAGLE's ground service equipment was the only theory advanced at trial, Afoa was required to produce evidence of the Port's authority to control how maintenance was conducted, not merely whether maintenance was performed. It contends that evidence of its specific control over the manner of making repairs to defective equipment is required for liability. The Port relies on case law that the authority to inspect work, order it stopped, or enforce compliance with a contract is an inadequate retention of the right to control.[46] But the retained control standard requires consideration of the entire context of control.[47]

Our Supreme Court's analysis in Afoa I is instructive. There, the court rejected the Port's argument that the retained control doctrine did not apply to it because it was merely a licensor.[48] Noting that the Port made "this argument notwithstanding the fact that, if everything Afoa alleges is true, . . . the Port appears to exercise nearly plenary control over Sea-Tac and the manner in which work is performed on the premises[,]" the court determined, "when an entity . . . *retains control over the manner in which work is*

---

[46] See Kamla, 147 Wn.2d at 120-21; Hennig v. Crosby Group, 116 Wn.2d 131, 134, 802 P.2d 790 (1991).

[47] See Phillips v. Kaiser Aluminum & Chem. Corp., 74 Wn. App. 741, 750, 875 P.2d 1228 (1994) ("Whether a right to control has been retained depends on the parties' contract, the parties' conduct, and other relevant factors. One such factor is a principal/employer's interference in the work of the independent contractor; however, a *right* to control can exist even in the absence of that factor.").

[48] Afoa I, 176 Wn.2d at 478-82.

*done on a work site*, that entity has a duty to keep common work areas safe."[49] "Calling

the relationship a license does not change reality. If a jury accepts Afoa's allegations,

the Port controls the manner in which work is performed at Sea-Tac Airport, controls the

instrumentalities of work, and controls workplace safety."[50]

In arriving at this holding, the Supreme Court recognized that not every licensor

or jobsite owner takes on a common law duty to maintain a safe workplace anytime it

requires on-site workers to comply with safety rules and regulations: *"But where a*

*licensor undertakes to control worker safety in a large, complex work site like Sea-Tac*

*Airport and is in the best position to control safety, there is a duty to maintain safe*

*common work areas within the scope of retained control.*[51] The court noted,

> [T]his holding also recognizes what is fair: that a jobsite owner *who*
> *exercises pervasive control over a work site should keep that work site*
> *safe for all workers*, just as a general contractor is required to keep a
> construction site safe under Kelley, and just as a master is required to
> provide a safe workplace for its servants at common law.[52]

The court's analysis in Afoa I is consistent with comment c to the *Restatement*

*(Second) of Torts* § 414:

> [T]he employer must *have retained at least some degree of control over*
> *the manner in which the work is done.* It is not enough that he has merely
> a general right to order the work stopped or resumed, to inspect its
> progress or to receive reports, to make suggestions or recommendations
> which need not necessarily be followed, or to prescribe alterations and
> deviations. Such a general right is usually reserved to employers, but it
> does not mean that the contractor is controlled as to his methods of work,
> or as to operative detail. *There must be such a retention of a right of*

---

[49] Id. at 478 (emphasis added).

[50] Id. at 478-79.

[51] Id. at 481 (emphasis added).

[52] Id.

14

*supervision that the contractor is not entirely free to do the work in his own way.*[53]

The holding in Afoa I is also consistent with the federal "multi-employer workplace doctrine." Under that doctrine, "an employer who controls or creates a workplace safety hazard may be liable under [federal law] even if the injured employees work only for a different employer."[54] And as this court has recognized, "the deciding factor in those [multi-employer] cases was not how much the employer participated in the planning or the execution of that plan, *but how much supervisory control it had.*"[55]

In Afoa I, the court described the evidence alleged by Afoa giving rise to questions of fact requiring trial:

> Afoa alleges that the Port retains control over the Airfield Area and that any activity there is "subject at all times to the exclusive control and management by the Port." At oral argument, the Port's attorney conceded that the purpose of the Port's rules and regulations is to control the tarmac. Afoa also alleges the Port retains control through its license agreement with EAGLE, requiring EAGLE to abide by all Port rules and regulations and allowing the Port to inspect EAGLE's work. Finally, Afoa alleges the Port retains control over EAGLE by conduct. He specifically claims that the Port continuously controls the actions of EAGLE and its employees and that they are subject at all times to the Port's pervasive and overriding supervision and control.
>
> Viewing this evidence in the light most favorable to Afoa, a reasonable jury could conclude that the Port had sufficiently pervasive control over EAGLE and Afoa to create a duty to maintain a safe workplace.[56]

---

[53] (Emphasis added.)

[54] Afoa I, 176 Wn.2d at 472 (citing Martinez Melgoza & Assocs. v. Dep't of Labor & Indus., 125 Wn. App. 843, 848-49, 106 P.3d 776 (2005)).

[55] Martinez, 125 Wn. App. at 853 (emphasis added).

[56] Afoa I, 176 Wn.2d at 482 (emphasis added) (internal citation omitted).

At trial, Afoa provided evidence of all the examples of control approved in Afoa I, as well as evidence that

- EAGLE's Licensing Agreement controls parking of ground service equipment not in use (such as the cargo loader Afoa hit). "Any equipment that hinders circulation or is stored in an unsafe or disorderly fashion, *as determined solely by the Port,* is subject to towing, impoundment and storage charges."[57]

- In 2006, a pushback experienced brake failure and crashed into a fence. The Port ramp patrol cited the driver for reckless driving, escorted him off the airfield, and conditioned his airfield driving privileges on repeating a Port training course. The Port Manager of Airport Certification requested emphasis briefing on vehicle inspections and safety and verification of *"the complete repair of vehicle 300's brake system before it is put back in service on the AOA."*[58]

- In August 2008, another pushback experienced brake failure, and the Port requested that "[b]y 1600 on the 6 of August please provide me with written confirmation that a complete equipment safety review has been complete. . . . *Any equipment found non-functional in anyway [sic] will be removed from service until the equipment is properly repaired.*"[59]

- John Nance, a Sea-Tac-based airline pilot, aviation expert, and former Port spokesman, testified that "[s]omeone has to be responsible for the overall operation or you have a community that is in chaos," and that "it is to *the super authoritative source, which in this case is the Port of Seattle, that responsibility really does lie.*"[60] Nance testified that under the Port's airline and ground services contracts, and its rules, enforced by ramp patrol, Port police, and Port fire department, the Port controls the work on the ramp areas: "[T]hey control the means of work. They control the instrumentalities of work. They control the people who work there, and they control workplace safety. That's the Port on the ramp areas."[61]

---

[57] Port Ex. 311 ¶11(B) (emphasis added). The Port further controls parking through its rules. See Port Ex. 482 at 54 ¶ 12 ("No person shall park any motor vehicle or other equipment . . . in the Air Operations Area . . . except . . . at such points as prescribed by the [airport] Director").

[58] Port Ex. 208 at 2 (emphasis added).

[59] Port Ex. 72 (emphasis added).

[60] RP (Mar. 3, 2015) at 1502-03 (emphasis added).

[61] Id. at 1544.

"Substantial evidence exists if a rational, fair-minded person would be convinced by it."[62] Though the trier of fact is free to believe or disbelieve any evidence presented at trial, "[a]ppellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact."[63]

Consistent with the holding in Afoa I, viewing the evidence in the light most favorable to Afoa, the Port had extensive authority over the work of moving aircraft equipment on the ramp, including the suitability and safety of equipment. The Port's level of supervision was beyond the general right referred to in comment c of the *Restatement*. In particular, the Port had the authority to red tag or impound any defective motorized equipment, require the equipment be fixed, and prohibit use of that equipment until adequately repaired. Such evidence that the Port had absolute control over the use of that instrumentality in the performance of EAGLE's work in turn is evidence of the Port's control over EAGLE's manner of work in using that instrumentality. The Port did not merely have a right to inspect and enforce compliance with a contract.

Therefore, we conclude substantial evidence supports the jury's finding that the Port retained a right to control the manner of EAGLE's work, including how EAGLE maintained its equipment.

---

[62] In re Estate of Palmer, 145 Wn. App. 249, 265-66, 187 P.3d 758 (2008).

[63] Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009).

### III. Federal Preemption

The Port argues that "[e]ven if this Court decides the Port retained the required control, reversal is still required" because federal law preempts Afoa's claims.[64] We disagree.

Congressional intent is the touchstone of preemption.[65] We must assume "Congress does not intend to supplant state law."[66] "State laws are not superseded by federal law unless that is the clear and manifest purpose of Congress."[67] "The presumption against preemption is 'even stronger with state regulation regarding matters of health and safety,' in which states have traditionally exercised their sovereignty."[68] The burden of proof is on the party claiming preemption.[69]

The Port first asserts the Airline Deregulation Act expressly preempts Afoa's claims. The Airline Deregulation Act preempts any statutes or regulations "related to a price, route, or service of an air carrier."[70] Because the Act does not apply to ground crew services or their manner of work, the Port's argument fails.

---

[64] Appellant's Br. at 30.

[65] Wyeth v. Levine, 555 U.S. 555, 565, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009).

[66] N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995).

[67] Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 326-27, 858 P.2d 1054 (1993).

[68] Hue v. Farmboy Spray Co., Inc., 127 Wn.2d 67, 78-79, 896 P.2d 682 (1995) (quoting id. at 327).

[69] Inlandboatmen's Union of the Pac. v. Dep't of Transp., 119 Wn.2d 697, 702, 836 P.2d 823 (1992).

[70] 49 U.S.C. § 41713(b)(1).

The Port next asserts implied conflict preemption. Conflict preemption exists "where 'compliance with both federal and state regulation is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[71] The Port claims that by allowing Afoa to use federal standards to prove the Port's level of control for state tort law purposes, the Port was penalized for doing what federal law requires. But it is not a penalty to be held liable for failing to do what both federal and state law contemplates, that is, run a safe airport. While federal law may require that the Port maintain control over the work site, state law does not penalize that control. Instead, state law imposes certain worker safety standards. The tort action does not penalize the Port for exercising control to the extent such control is a byproduct of federal regulation; rather, it holds the Port accountable for doing it poorly. Because we find no case law supporting the Port's proposition, we conclude there is no implied conflict preemption.

Finally, the Port asserts implied field preemption. Field preemption exists where the scheme of federal regulation is "'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'"[72] The comprehensiveness of federal law in the field and "pervasiveness of the regulations" are "indication[s] of preemptive intent."[73]

---

[71] Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992) (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963) and Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)).

[72] Id. (quoting Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982))

[73] Montalvo v. Spirit Airlines, 508 F.3d 464, 470 (9th Cir. 2007).

In Estate of Becker v. Avco Corp., our Supreme Court recently held there is no field preemption of state law standards of care in airplane product liability and negligence actions involving a defective carburetor float.[74] The court noted that "the Federal Aviation Act directs the FAA to create 'minimum standards' surrounding aviation safety[,]" indicating "that federal regulations are a floor for engine design standards."[75] Even though there are extensive FAA regulations of fuel systems, the court concluded, "the regulations are not comprehensive or pervasive enough to show Congress' intent to preempt state law. The Federal Aviation Act . . . was not designed to take the place of state tort remedies, but rather to create a federal minimum."[76]

Similarly, there is no pervasive federal regulation of the use of safe equipment in performing the work of moving aircraft on the airplane ramp. At most, there are a few advisory bulletins with vague and general standards. Therefore, there is no implied field preemption.

We conclude the Port fails to meet its burden of establishing preemption.

CROSS APPEAL

*I. Nondelegability*

Afoa argues that the jury should not have been allowed to allocate fault to the four nonparty airlines that used EAGLE's ground services because the Port had a nondelegable duty to maintain a safe workplace. The Port counters that it did not have

---

[74] ___ Wn.2d ___, 387 P.3d 1066 (2017).

[75] Id. at 1070 (internal quotation marks omitted).

[76] Id. at 1071.

a nondelegable duty, and even if it did, RCW 4.22.070(1) still requires allocation of fault.

The Port, however, appears to have conceded below that it had a nondelegable duty:

> The Court has established it was <u>Stute</u> that says *there's a nondelegable duty, okay, so you can't delegate*, but there's no such thing in any of these cases that says there's a per se liability going on here.
>
> . . . .
>
> And one of our principal defenses in this case is that EAGLE had the primary responsibility to, in fact, maintain its equipment under all of these regulations, and the jury then has to decide were we negligent in relying upon that once you–if you get there. If you get to that duty, was it ok for the Port to reasonably rely upon those people, EAGLE, to maintain their equipment under the facts of the case . . . ? There's no such thing as per se liability.
>
> . . . .
>
> *We just can't delegate it*, but the jury can clearly find that it was EAGLE's duty. They had the primary duty.[77]

Further, without regard to the Port's concession, ample authority recognizes the duty to maintain a safe workplace is nondelegable.[78] At common law, a general contractor had no duty to the employees of its independent subcontractor, unless the general contractor retained control over part of the work.[79] In <u>Kelley</u>, the Supreme Court explicitly held a general contractor had a nondelegable duty under the then-existing workplace safety statute to ensure the safety of all workers on a jobsite.[80] In <u>Stute</u>, the Supreme Court held a general contractor has a nondelegable duty to ensure compliance with safety regulations under WISHA for the protection of all employees at

---

[77] RP (Mar. 13, 2015) at 2437-38 (emphasis added); CP at 4379.

[78] <u>Kelley</u>, 90 Wn.2d at 330; <u>Stute</u>, 114 Wn.2d at 464; <u>Millican v. N.A. Degerstrom, Inc.</u>, 177 Wn. App. 881, 890-94, 313 P.3d 1215 (2013).

[79] <u>Kelley</u>, 90 Wn.2d at 330.

[80] <u>Id.</u> at 332-33 (citing former RCW 49.16.030 (1919), *repealed by* Laws of 1973, ch. 80, § 28, which imposed a duty on all employers to furnish a reasonably safe place of work, with reasonable safety devices, and to comply with state safety regulations).

the work site, including the employees of a subcontractor.[81] The court concluded the general contractor assumes primary responsibility because its "innate supervisory authority constitutes per se control over the workplace."[82] The court explained that the policy rationale for placing this responsibility on a general contractor is because the "general contractor's supervisory authority places the general in the best position to ensure compliance with safety regulations."[83]

The Port argues the nondelegable duty to provide a safe workplace under WISHA applies only to general contractors, whereas the Port is a jobsite owner. We disagree.

The Port ignores that the Afoa I court determined that "the Port is closely analogous to a general contractor."[84] And in Kamla v. Space Needle Corp., the Supreme Court held that jobsite owners could have duties equivalent to general contractors: "Jobsite owners can run the gamut from an owner/developer with the same degree of knowledge about WISHA compliant work conditions as that of a general contractor to a public corporation without any knowledge about WISHA regulations governing a specific trade."[85] In Kinney v. Space Needle Corp., this court read Kamla to mean that sophisticated jobsite owners who exercise pervasive control over safety aspects of the work have "the same nondelegable duty of care to ensure WISHA

---

[81] Stute, 114 Wn.2d at 463-64.

[82] Id. at 464.

[83] Id. at 463.

[84] Afoa I, 176 Wn.2d at 474.

[85] 147 Wn.2d 114, 124, 52 P.3d 472 (2002).

compliant work conditions" as general contractors.[86] The Afoa I court agreed:

[A]lthough general contractors and similar employees *always* have a duty to comply with WISHA regulations, . . . jobsite owners have a duty to comply with WISHA only if they retain control over the manner in which contractors complete their work."[87] "Further, this duty extends to all workers on the jobsite that may be harmed by WISHA violations."[88]

The Port maintains that even if it had a nondelegable duty, RCW 4.22.070(1) still requires allocation of fault. But "[n]ondelegable duties involve a form of vicarious liability."[89] As Division III of this court noted in Millican v. N.A. Degerstrom, Inc., "'The label "nondelegable duty" does not mean that an actor is not permitted to delegate the activity to an independent contractor. Rather, the term signals that the actor will be vicariously liable for the contractor's tortious conduct in the course of carrying out the activity.'"[90] Therefore, when it comes to breach of common law duties arising from retained control and violations of WISHA, a jobsite owner has vicarious liability for breach of duties that are nondelegable.[91]

This court has recognized that in cases involving vicarious liability, there can be no comparative fault. For example, in Johnson v. Recreational Equipment, Inc. (REI),

---

[86] 121 Wn. App. 242, 249, 85 P.3d 918 (2004).

[87] Afoa I, 176 Wn.2d at 472 (citing Kamla, 147 Wn.2d at 125).

[88] Id.

[89] 6 WASHINGTON PRACTICE; WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 12.09 cmt. at 161 (6th ed. 2012); see generally 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 4:15, at 204-06 (4th ed. 2013).

[90] 177 Wn. App. 881, 896, 313 P.3d 1215 (2013) (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 57 cmt. b (2012)).

[91] See id. at 893.

Monika Johnson brought a product liability action against the seller of a defective bicycle fork.[92] REI argued that "the statutory comparative fault system adopted by our legislature in 1986 demands that it be permitted to ask the jury to allocate fault" to the fork's manufacturer for the defect.[93] This court disagreed: "Because a seller of a branded product is vicariously liable for manufacturing defects, permitting REI—the product seller liable as the manufacturer pursuant to RCW 7.72.040(2)(e)—to seek to allocate fault to Aprebic—the actual manufacturer of the defective product—would undermine the statutory scheme of the WPLA."[94] The Johnson court noted that "construing RCW 7.72.040(2)(e) such that a product seller could seek to allocate fault to a manufacturer would render the provision itself meaningless."[95]

Similarly, allowing the Port to allocate fault to the airlines would render the vicarious liability doctrines of retained control and WISHA specific duty meaningless. As the Afoa I court explained, the purpose of the retained control doctrine is "to place the safety burden on the entity in the best position to ensure a safe working environment."[96] It follows that if the purpose of that doctrine is to identify the entity best situated to ensure a safe workplace, then that entity should not be entitled to escape or

---

[92] 159 Wn. App. 939, 247 P.3d 18 (2011).

[93] Id. at 945.

[94] Id. at 948.

[95] Id. at 949.

[96] Afoa I, 176 Wn.2d at 479 (citing Kelley, 90 Wn.2d at 331).

reduce its vicarious responsibility to a tort victim based on others whose negligence also contributed to the injury.[97]

The Port relies on the Supreme Court's decision in Gilbert H. Moen Co. v. Island Steel Erectors, Inc.[98] But Moen does not support the Port's argument that the nonparty airlines must be allocated fault and the Port's share of damages reduced proportionately. Rather, Moen merely holds that where a general contractor has an obligation based on the retained control doctrine and WISHA specific duty standard, it does not follow that a subcontractor employer is thereby relieved of its duty to comply with safety regulations and provide a safe workplace.[99]

Moen involved a general contractor who had settled with the employee of a subcontractor injured in an accident at the construction work site.[100] The general contractor sought contractual indemnification from the subcontractor.[101] The Moen court held that notwithstanding RCW 4.22.070, the parties' "indemnification agreement negotiated pursuant to RCW 4.24.115" was valid and enforceable.[102] Moen does not stand for the proposition that a party who has vicarious liability for another's breach may

---

[97] The Port argues that the list of specific exceptions to RCW 4.22.070 (i.e., master-servant; acting as an agent; acting in concert; Title 51 employers per 1993 amendments) is an exclusive list of exceptions from the statutory directive that all entities "shall" be allocated fault. But as discussed, we do not read the comparative fault statute to render the established retained control doctrine and WISHA specific duty standard meaningless.

[98] 128 Wn.2d 745, 912 P.2d 472 (1996).

[99] Id. at 757-59.

[100] Id. at 748-51.

[101] Id.

[102] Id. at 747.

escape any of its vicarious liability by allocating fault to the breaching party. We note that the Port has not advanced any theory of contribution or indemnification as to the four nonparty airlines.

Therefore, we conclude the Port had a nondelegable duty to ensure a safe workplace and safe equipment and is vicariously liable for breach of that duty. Consistent with the Port's vicarious liability, it is not entitled to proportionately reduce its liability based upon an allocation of fault to the four nonparty airlines.

We affirm the jury's verdict as to the liability of the Port, reverse the portion of the judgment allocating 74.8 percent fault to the airlines, and remand for entry of an amended judgment.[103]

WE CONCUR:

_Trickey, J_

_____

_____

---

[103] Accordingly, we need not address the other issues Afoa raises on cross appeal.