STEPHENS, J. (dissenting)
¶ 48 In our first appeal in this case, we stated, "The Port [of Seattle] is the only entity with sufficient supervisory and coordinating authority to ensure safety in this complex, multiemployer work site. If the Port does not keep Sea-Tac Airport safe for workers, it is difficult to imagine who will." Afoa v. Port of Seattle, 176 Wash.2d 460, 479, 296 P.3d 800 (2013) ( AfoaI ). A jury subsequently found that the Port retained a right of control over Brandon Afoa's work conditions at Seattle-Tacoma International Airport (Sea-Tac Airport), giving rise to a nondelegable duty. It also found that the Port was negligent. Respecting the jury's verdict, the Court of Appeals correctly held that the Port's breach of its nondelegable duty makes it jointly and severally liable for Afoa's injuries arising from work site safety breaches, regardless of whether other entities are also liable. Afoa v. Port of Seattle, 198 Wash. App. 206, 234, 393 P.3d 802 (2017) ( AfoaII ). Joint and several liability in this context is integral to the nondelegable duty doctrine and is fully consistent with RCW 4.22.070. Thus, the majority's recognition that RCW 4.22.070(1)(a) preserves joint and several liability when a defendant owes a nondelegable duty should end the matter. We should affirm the Court of Appeals.
¶ 49 The majority's contrary holding renders the nondelegable duty doctrine meaningless. Its tangled discussion of how the Port and the airlines owed concurrent, separate nondelegable duties cannot obscure the fact that unless the Port is held vicariously liable for the safety breaches that caused Afoa's injuries, its duty is no longer "nondelegable." To quote the Arizona Supreme Court, "[H]ow can it be that one can admit to the existence of a non-delegable duty, but then disclaim liability for the non-performance of that duty? The concepts are mutually exclusive." Wiggs v. City of Phoenix, 198 Ariz. 367, 370, 10 P.3d 625 (2000). The result of the majority's decision will be to dramatically change the law and to eviscerate the protections for workers at multiemployer work sites recognized under the Washington Industrial Safety and Health Act of 1973 (WISHA), ch. 49.17 RCW, and our precedent. I respectfully dissent.
¶ 50 I begin by looking closer at the history of the nondelegable duty doctrine, which *916 reflects a policy-based expansion of traditional vicarious liability principles recognized in the "master-servant" relationship in agency law. I then identify the jury instructions and special verdict that make clear what the jury found in this case: the Port breached its nondelegable duty to provide a safe workplace, giving rise to vicarious liability. Finally, I consider RCW 4.22.070 and related statutory provisions to show that joint and several liability remains intact in cases such as this despite the general statutory preference for several liability among joint tortfeasors. As a result, the Port is vicariously liable for the share of fault the jury allocated to the nonparty airlines.
I. The Nondelegable Duty Doctrine Imposes Vicarious Liability on the Port for the Airlines' Negligence Because the Port Retained Control over Safety Matters at Sea-Tac Airport
¶ 51 This case involves the nondelegable duty theory of vicarious liability, under which a general contractor or owner is jointly and severally liable for failure to maintain a reasonably safe workplace. This theory of liability arose in the common law as an exception to the general rule that one who engages an independent contractor is not liable for injuries sustained by an independent contractor's employees. It is also specifically recognized under WISHA, which places the primary duty for work site safety on a general contractor or employer with retained control. Because nondelegable duties involve a form of vicarious liability, the general contractor or owner is not only directly liable for breach of its own duty to ensure a safe workplace but also vicariously liable for the failure of others to provide a safe workplace.
¶ 52 Afoa's claims against the Port are premised on the nondelegable duty doctrine. AfoaI, 176 Wash.2d at 464, 296 P.3d 800 (recognizing Port's potential liability under two theories of liability previously applied in other multiemployer workplace cases: (1) "the duty of a general contractor to maintain a safe common area for any employee of subcontractors" and (2) "for breach of safety regulations under [WISHA]").[1] The Port does not dispute that the jury found the Port retained control over the work of Afoa's employer, Evergreen Aviation Ground Logistics Enterprise Inc. (EAGLE), giving rise to a nondelegable duty. The Port insists, however, that RCW 4.22.070 abrogated joint and several liability in the nondelegable duty context, and that because the jury was never asked whether the Port retained control over the airlines, who hired EAGLE, there is no factual finding to support vicarious liability. Suppl. Br. of Pet'r/Cross-Resp't at 6-8, 10. To understand why these arguments are wrong, it is necessary to trace the history and purpose of the nondelegable duty doctrine, both under the common law and under WISHA.
A. The Port Owes a Common Law Nondelegable Duty To Maintain Safe Common Work Areas
¶ 53 AfoaI recognizes that "[u]nder our common law safe workplace doctrine, landowners and general contractors that retain control over a work site have a duty to maintain safe common work areas." 176 Wash.2d at 475, 296 P.3d 800. Our common law safe workplace doctrine operates as an exception to the general rule, sometimes called the "independent contractor rule," that an employer who contracts with an independent contractor is not liable for injuries sustained by the independent contractor's employees. RESTATEMENT ( SECOND ) OF TORTS § 409 ( AM. LAW INST. 1965) ; Kelley v. Howard S. Wright Constr. Co., 90 Wash.2d 323, 330, 582 P.2d 500 (1978) ; Stute v. P.B.M.C., Inc., 114 Wash.2d 454, 460, 788 P.2d 545 (1990). Under the safe workplace doctrine, if the employer retains control over some part of the independent contractor's work, the employer owes a nondelegable duty within the scope of that control to provide a reasonably safe workplace. Stute, 114 Wash.2d at 460, 788 P.2d 545 ; Kennedy v. Sea-Land Serv., Inc., 62 Wash. App. 839, 851, 816 P.2d 75 (1991) ; RESTATEMENT ( SECOND ) OF TORTS § 414.
*917 ¶ 54 In Afoa I , we described the origins of the common law safe workplace doctrine as rooted in "master-servant" agency principles:
Historically, our common law workplace safety doctrine has its roots in the master-servant relationship. At common law, a "master" has a duty to its "servant[s]" to maintain a reasonably safe place to work.
Over time, we have expanded the doctrine beyond the narrow confines of the master-servant relationship.
176 Wash.2d at 475, 296 P.3d 800 (citation omitted) (citing Myers v. Little Church by Side of Rd., 37 Wash.2d 897, 901-02, 227 P.2d 165 (1951) ). To shed light on the doctrine's evolution, we discussed three key cases-Myers, Kelley, and Kamla v. Space Needle Corp., 147 Wash.2d 114, 52 P.3d 472 (2002). In Myers, a hotel contracted with an elevator company to repair a defective elevator and make weekly service calls. 37 Wash.2d at 900, 227 P.2d 165. An employee of the hotel was subsequently injured while operating the faulty elevator. The employee sued the hotel to recover damages for his injuries, and the hotel sought to avoid liability by arguing that the employee's injuries were caused by the independent contractor's negligence. In holding that the independent contractor's negligence was imputable to the hotel, the Myers court reasoned that "[t]he master's duty to provide the servant with a reasonably safe place to work is nondelegable," and therefore the hotel "cannot escape liability for the negligence of the elevator company on the theory that the latter was an independent contractor." Id. at 904, 227 P.2d 165. Importantly, the basis of the hotel's liability was vicarious liability under the nondelegable duty to provide a safe workplace, not the hotel's direct relationship with the employee.
¶ 55 Kelley and Kamla extended the Myers rule to general contractors and jobsite owners. In Kelley, a general contractor argued that it had no duty to provide a safe workplace for the plaintiff, an employee of a subcontractor, because there was no master-servant relationship between the parties. 90 Wash.2d at 329, 582 P.2d 500. The general contractor invoked the "independent contractor rule," arguing that a principal who hires an independent contractor is not liable for harm resulting from the contractor's work. We refused to so limit the doctrine to the master-servant relationship and instead imposed a safe workplace duty on the general contractor irrespective of the precise contractual relationship between the parties. Id. at 330, 582 P.2d 500 ; see also AfoaI , 176 Wash.2d at 477, 296 P.3d 800 ("We held that the relevant inquiry is whether the principal retained control over the work site, not whether there was a direct employment relationship between the parties." (describing the holding in Kelley ) ).
¶ 56 In Kamla, we considered whether the common law safe workplace doctrine applied to a jobsite owner, just as it applied to the general contractor in Kelley. 147 Wash.2d at 119-20, 52 P.3d 472. We held that the doctrine was not strictly limited to general contractors and that a jobsite owner could be liable under a common law safe workplace theory if the jobsite owner retained the right to control the manner in which the independent contractor completed its work. Id. at 121, 52 P.3d 472. Regarding the issue of control, the Kamla decision clarified that the test is not whether there is an actual exercise of control but, rather, whether the jobsite owner retains a right to direct or interfere with the manner in which the work is performed. Id. Because the jobsite owner in Kamla did not assume responsibility for worker safety or retain the right to control or interfere in any way with the manner in which the independent contractor and its employees worked, we held that the owner did not retain the relevant control to support a nondelegable duty and was therefore not liable for the employee's injuries. Id. at 121-22, 52 P.3d 472.
¶ 57 Kelley and Kamla stand for the proposition that "the existence of a safe workplace duty depends on retained control over work, not on labels or contractual designations such as 'independent contractor' or 'general contractor.' " AfoaI , 176 Wash.2d at 477, 296 P.3d 800. We relied on that proposition in AfoaI to reject the Port's argument that it owed no duty to Afoa under Kelley , which the Port contended applies only to general contractors, whereas the Port was a *918 mere "licensor." Id. at 478, 296 P.3d 800 ("Calling the relationship a license does not change reality."). We clarified that " Kelley does not limit its application to a narrow variant of the employment relation. It does not require a 'master' or 'servant,' an 'employer' or 'employee,' or indeed any specific combination of contractual relationships." Id. To the contrary, Kelley and Kamla mandate that "when an entity (whether a general contractor or a jobsite owner) retains control over the manner in which work is done on a work site, that entity has a duty to keep common work areas safe because it is best able to prevent harm to workers." Id. We explained in AfoaI how that duty applies in this case: "[W]here a licensor undertakes to control worker safety in a large, complex work site like Sea-Tac Airport and is in the best position to control safety, there is a duty to maintain safe common work areas within the scope of retained control." Id. at 481, 296 P.3d 800.[2]
B. The Port Owes a Statutory Nondelegable Duty To Ensure WISH A Compliance
¶ 58 The Port owed Afoa not only a common law duty to provide a safe workplace but also a nondelegable statutory duty to ensure compliance with WISHA regulations. Our decision in AfoaI recognized that jobsite owners, such as the Port, owe a specific duty to prevent WISHA violations when they retain control over work done on a jobsite. Id. at 472-73, 296 P.3d 800. Under WISHA, all employers must comply with distinct duties arising from RCW 49.17.060 's two subsections. Id. at 471, 296 P.3d 800 (citing Goucher v. J.R. Simplot Co., 104 Wash.2d 662, 671, 709 P.2d 774 (1985) ). Subsection (1) creates a " 'general duty' " for all employers to maintain a workplace free from recognized hazards, and this duty runs from an employer to its own employees. Id. Subsection (2) creates a separate, " 'specific duty' " for employers to comply with WISHA regulations. Id. "Unlike the general duty, the specific duty runs to any employee who may be harmed by the employer's violation of the safety rules." Id.
¶ 59 The AfoaI decision confirmed that a jobsite owner, such as the Port, is not per se liable for all WISHA violations at the work site. Whereas general contractors always have a duty to comply with WISHA regulations, "jobsite owners have a duty to comply with WISHA only if they retain control over the manner in which contractors complete their work." Id. at 472, 296 P.3d 800. If a jobsite owner retains control over "the manner and instrumentalities of work being done on the jobsite," the owner has a nondelegable specific duty to comply with WISHA regulations, and this duty extends to all workers on the jobsite. Id. ; see also Stute, 114 Wash.2d at 464, 788 P.2d 545 (recognizing general contractor's liability to subcontractor's employee based on violation of WISHA and reasoning that a "general contractor should bear primary responsibility for compliance with safety regulations because the general contractor's innate supervisory authority constitutes *919 sufficient control over the workplace").
¶ 60 We held in AfoaI that if the jury determined the Port retained a right to control the manner in which Afoa's employer performed its work or maintained safe conditions, the Port owed a nondelegable specific duty under WISHA. 176 Wash.2d at 473-74, 296 P.3d 800. In so holding, we flatly rejected the Port's argument that it did not owe Afoa a duty to comply with WISHA regulations because the Port's relationship with EAGLE and Afoa was only that of licensor and licensee. Id. at 473, 296 P.3d 800 (noting WISHA's specific duty does not require a direct employment relationship). We explained that reading the statute narrowly would "contravene both federal law and WISHA's clearly articulated policy of protecting workplace safety." Id. Responding to the dissent's view that WISHA duties should be limited to either direct employment or employer-subcontractor relationships, we reiterated that we had never so limited WISHA duties and it would be improper to do so in this case:
The Port operates a major airport facility, is responsible for its own employees, and allows controlled access to thousands of employees of other employers. Under these circumstances, the Port is closely analogous to a general contractor.
Id. at 474, 296 P.3d 800.
¶ 61 As with the common law safe workplace doctrine, liability under the WISHA specific nondelegable duty doctrine results in vicarious liability. This is because a control party, such as the Port, "bear[s] the primary responsibility for compliance with safety regulations." Stute , 114 Wash.2d at 464, 788 P.2d 545. Though subcontractors and others at the work site retain concurrent responsibility to meet workplace safety standards, "the primary employer, the general contractor, has, as a matter of policy, the duty to comply with or ensure compliance with WISHA and its regulations" because the general contractor's supervisory authority places it in the best position to ensure WISHA compliance for the safety of all workers. Id. at 463, 788 P.2d 545 ; Gilbert H. Moen Co. v. Island Steel Erectors, Inc., 128 Wash.2d 745, 756-58, 912 P.2d 472 (1996).
¶ 62 Consequently, a violation of WISHA by a subcontractor is not only chargeable to the subcontractor but also chargeable to a general contractor-"the primary employer," whose supervisory authority puts it "in the best position to ensure compliance with safety regulations." Stute, 114 Wash.2d at 463, 788 P.2d 545 ; Millican v. N.A. Degerstrom, Inc., 177 Wash. App. 881, 893, 313 P.3d 1215 (2013). As Professor Prosser has explained, cases based on the nondelegable duty doctrine hold "the employer liable for the negligence of the contractor, although he has himself done everything that could reasonably be required of him. They are thus cases of vicarious liability." WILLIAM L. PROSSER, THE LAW OF TORTS 470 (4th ed. 1971).
¶ 63 This is such a case. Afoa's theory of liability against the Port is premised on his claim that the Port owed a nondelegable duty to ensure a safe work site at Sea-Tac Airport, including safe maintenance of the vehicle he was driving when he was injured. The Port's nondelegable duty arises under both the common law and WISHA. To establish this duty, Afoa had to prove to the jury that the Port retained a right of control over work site safety conditions. Because Afoa worked for EAGLE, the relevant control focused on EAGLE's work site conditions. This legal framework provides the backdrop for properly assessing the import of the jury's verdict in this case.
II. The Jury Instructions and the Verdict Establish that the Port Breached Its Nondelegable Duty To Maintain a Safe Work Site and Is Vicariously Liable for the Airlines' Negligence
¶ 64 Following six weeks of trial, the jury rendered a verdict in favor of Afoa and determined his damages totaled $40 million. Clerk's Papers (CP) at 4841. The jury found that the Port retained the right to control the manner in which Afoa's employer, EAGLE, performed its work and maintained its equipment, and also found that the combined negligence of the Port, the nonparty airlines, and Afoa proximately caused Afoa's injuries. Id. at 4839-41. In light of the jury instructions and the special verdict form, the jury's verdict is dispositive of three things: (1) the Port *920 retained a right of control to ensure compliance with safety standards in the workplace, (2) the Port therefore owed a nondelegable common law and WISHA specific duty to Afoa, and, as a result, (3) the Port is directly and vicariously liable for Afoa's injuries.
¶ 65 The Port's insistence that its liability must be separated from the airlines' liability ignores the way this case was tried. At trial, the Port argued that there was no evidence "that says the Port of Seattle retains the right to control how the air carriers do their work or maintain their equipment or how the ground support providers do their work or maintain their equipment." Verbatim Report of Proceedings (Mar. 25, 2015) (VRP) at 3512; see also id. at 3514-15, 3520-21. To support this position, the Port relied on "documentary evidence that the Port of Seattle did not retain the right to control how the air carriers or its ground support providers did their work," which included (1) the Port's signatory lease and operating agreements (SLOAs), signed by each of the four nonparty airlines,[3] (2) EAGLE's ground service operating license agreement with the Port,[4] and (3) the Port's rules and regulations.[5] Id. at 3514-20. The Port argued that this evidence proved that the Port did not retain the right to control "how the ground support people maintained their equipment, how the air carriers maintained their equipment, how they did their job." Id. at 3520-21.
¶ 66 The jury instructions defined the nature and scope of the Port's liability. First, jury instruction 13 explained to the jury the bases of the Port's alleged negligence:
(a) The plaintiff claims the defendant retained the right to control the manner in which the plaintiff's employer, [EAGLE], performed its work and maintained the equipment used by EAGLE to provide ground support for the non-party air carriers ... and failed to maintain a safe work site.
....
(c) The plaintiff also claims that because defendant allegedly retained control of the manner in which EAGLE employees performed their work and maintained their equipment, the defendant had a duty to ensure compliance with [WISHA] regulations related to that work, which it failed to do.
CP at 4795 (omitting Afoa's premises liability claim). The same instruction explained the Port's affirmative defense that the airlines were negligent for
Failing to comply with applicable safety regulations; and/or Failing to provide the plaintiff with a safe place to work.
CP at 4796.[6]
¶ 67 Jury instruction 23 told the jury that the Port had a nondelegable duty to maintain a safe workplace
only if the landowner retains the right to control the manner and instrumentalities by which the work is performed by that worker at the job site.
*921 CP at 4807. Jury instruction 26 addressed the Port's nondelegable statutory duty, explaining that
[a] land owner, like the defendant, has a duty to ensure compliance with applicable safety regulations ... only if the land owner retains the right to control the manner and instrumentalities by which the work is performed by that worker at the job site.
CP at 4810. Finally, jury instruction 28 specifically addressed the retained control test in the context of landowners, such as the Port:
Authority to inspect work, order it stopped and started, or require contract compliance do not alone constitute retention of the right to control the manner and instrumentalities by which a worker who is not directly employed by a land owner performs work at a job site.
CP at 4812. These jury instructions adhere to the nondelegable duty doctrine described in AfoaI .
¶ 68 Question 1 on the special verdict form asked the jury whether the Port "retain[ed] a right to control the manner in which the plaintiff's employer, [EAGLE], performed its work or maintained its equipment used to provide ground support work for the non-party air carriers." CP at 4839. This was the sole question concerning retained control, and the Port argued to the jury:
These are the reasons why you must answer question number 1 "no." The Port did not retain the right to control how the ground support people provided, maintained their aircraft-excuse me, how the ground support people maintained their equipment, how the air carriers maintained their equipment, how they did their job. The Port simply did not do that. They did not retain the right to control. The answer to that question is no.
VRP at 3520-21.
¶ 69 Underscoring that the key disputed issue was who was responsible for the safety breaches that caused Afoa's injuries, the Port urged the jury to find that the airlines, not the Port, retained control:
And if somebody was going to see a problem, it would have been the air carrier. And if they saw, they had a duty to fix it. They had a duty to tell EAGLE to fix that equipment. That's the right-that's the control they retained.
VRP at 3530-31; see also id. at 3532-33 ("They have sued the wrong party, and the Port of Seattle has been wrongly accused of doing something wrong.").
¶ 70 Rejecting the Port's argument, the jury answered question 1, "Yes." CP at 4839. Its affirmative answer conclusively establishes that the Port retained the relevant right to control the manner and instrumentalities of Afoa's work, as described injury instruction 28, relating directly to the circumstances of his injury. It also establishes that the Port had a nondelegable common law duty to maintain a safe work site at Sea-Tac Airport, consistent with jury instruction 23, and a nondelegable, statutory specific duty to ensure WISHA compliance, consistent with jury instruction 26.
¶ 71 The jury's verdict is dispositive that the Port's control over the work site is sufficiently analogous to that of a general contractor to support the nondelegable duty theory of vicarious liability. As a result, the Port, no less than a general contractor, is not only directly liable for its own negligence but also vicariously liable for safety breaches by others.
¶ 72 The majority misunderstands the import of the verdict when it insists that the jury needed to separately find the Port exercised control over the air carriers in addition to EAGLE. Majority at 911. This was not even the Port's theory.[7] As the Port's closing argument makes clear, the parties understood *922 at trial that the special verdict interrogatory fully covered the issue of the Port's retained control over Afoa's work conditions by asking whether it controlled EAGLE'S manner of work. No one advanced the agency theory of "entity control" that the majority insists on. See majority at 911 & n.12 (citing Moss v. Vadman, 77 Wash.2d 396, 402-03, 463 P.2d 159 (1969) ; Matsumura v. Eilert , 74 Wash.2d 362, 368, 444 P.2d 806 (1968) ). And there is no case that supports the majority's fiction of multiple nondelegable duties.
¶ 73 To support its view that the Port and the airlines each breached independent nondelegable duties, the majority attaches great significance to the jury's finding that the airlines were negligent. Id. at 909-10, 912. This is not a reasonable reading of the verdict. As noted, there is no jury finding that the airlines retained control over Afoa's work conditions, only a finding that the Port retained control. The jury's verdict logically rests on its finding that the airlines failed to comply with safety regulations or maintain a safe work site with respect to matters under their direct control , as the Port alleged. See CP at 4796 (jury instruction 13), 4806 (jury instruction 22). Simply put, they were also at fault for the safety breaches that caused Afoa's injury. But this does not mean they breached a nondelegable duty. For reasons already discussed, the presence of concurrent duties at a multiemployer work site is unremarkable; of course a landowner and a contractor have concurrent duties under WISHA and the common law. In light of its retained control, however, the Port's workplace safety duty is seen as "prime" or "primary." Moen, 128 Wash.2d at 757, 912 P.2d 472. As we explained in AfoaI , only the Port "operates a major airport facility, is responsible for its own employees, and allows controlled access to thousands of employees of other employers." 176 Wash.2d at 474, 296 P.3d 800. Under these circumstances, only the Port is analogous to a general contractor and owes a nondelegable duty.
¶ 74 Under the nondelegable duty doctrine, the test of control is the right to exercise control over the manner of work and, more specifically under WISHA, compliance with safety standards. Here, the jury determined that the Port retained the requisite control at Sea-Tac Airport, including with respect to the maintenance of EAGLE's equipment directly relating to Afoa's injury. It therefore had a common law and statutory specific duty to maintain workplace safety without regard to whether others at the work site, including the airlines, also owed a duty. Because the nondelegable duty doctrine is a form of vicarious liability, the Port is responsible for the airlines' negligence, just as it would have been for EAGLE's negligence had the employer not been immune under Title 51 RCW. There was no need for any separate factual finding of retained control directly over the airlines. The majority's analysis misses the very point of the nondelegable duty doctrine-vicarious liability-and therefore fails to give proper effect to the jury's verdict.
¶ 75 Given the jury's clear finding that the Port breached its nondelegable duty, the only basis for relieving the Port of its liability for the airlines' share of the allocated fault is if RCW 4.22.070 abrogated vicarious liability in this instance. As explained below, the statute did no such thing. To the contrary, the legislature fully preserved joint and several liability under agency principles that subsume the nondelegable duty doctrine.
III. RCW 4.22.070 Preserves Joint and Several Liability for Defendants with Vicarious Liability under the Nondelegable Duty Doctrine
¶ 76 RCW 4.22.070 generally abolished joint and several liability among concurrent tortfeasors, preferring several liability based on proportionate fault. Moen , 128 Wash.2d at 760, 912 P.2d 472. The legislature recognized, however, that joint and several liability remains appropriate in narrow circumstances. Kottler v. State, 136 Wash.2d 437, 444, 963 P.2d 834 (1998). It therefore retained common law joint and several liability in situations where the defendant has traditionally been vicariously liable for the acts of another by virtue of an agency status or relationship. Under RCW 4.22.070(1)(a),
[a] party shall be responsible for the fault of another person or for payment of the *923 proportionate share of another party where both were acting in concert or when a person was acting as an agent or servant of the party.
The question in this case is whether RCW 4.22.070(1)(a) provides for joint and several liability when vicarious liability is based on the common law nondelegable duty doctrine. Stated differently, we must consider whether the phrase "acting as an agent or servant" encompasses the historical development of agency law beyond the simple "master-servant" context to include the nondelegable duty. See AfoaI , 176 Wash.2d at 475, 296 P.3d 800 (recognizing the nondelegable duty doctrine is an "expansion" of the master-servant relationship).
¶ 77 The Port urges a stingy reading of the statutory language. It insists that the plain language of RCW 4.22.070(1)(a) preserves joint and several liability only in master-servant or principal-agent relationships; by not mentioning the nondelegable duty doctrine, the Port argues, the legislature effectively abrogated it, or at least the doctrine's effect of creating vicarious liability. Pet. for Review at 18-19. This argument allows the Port to concede that the jury verdict establishes its breach of a nondelegable duty, but without its usual effect of incurring joint and several liability.
¶ 78 Significantly, the majority rejects the Port's literalistic interpretation of RCW 4.22.070(1)(a), though it ultimately agrees with the Port in result. The majority recognizes that RCW 4.22.070(1)(a) retains common law vicarious liability in nondelegable duty situations. Majority at 910-11. However, the majority also insists that joint and several liability premised on the WISHA specific or common law nondelegable duty to provide a safe workplace requires proof of a direct agency relationship. See id. at 912 ("The jury must find that the defendant controlled another entity before the defendant is vicariously liable for that other entity's negligence."). This notion of direct entity control is antithetical to the nondelegable duty doctrine, which was developed to expand vicarious liability beyond the narrow principal-agent, master-servant relationship. The key to finding a nondelegable duty is not entity control, but the right to control the manner of work at a multiemployer work site. The jury's verdict plainly establishes that the Port had such work site control at Sea-Tac Airport.
¶ 79 RCW 4.22.070(1)(a) is properly understood to embrace the nondelegable duty doctrine as a form of vicarious liability in agency law, without regard to direct entity control. As the majority concedes, RCW 4.22.070(1)(a) preserves common law vicarious liability in agency law. Id. at 911 (" RCW 4.22.070(1)(a) 'explicitly retains principles of common law vicarious liability' within its exceptions" (quoting Johnson v. Recreational Equip., Inc., 159 Wash. App. 939, 950, 247 P.3d 18 (2011) ) ).[8] Vicarious liability under the nondelegable duty doctrine arises from the very same principles as vicarious liability in the more traditional agency relationships the doctrine expands on. See RESTATEMENT ( SECOND ) OF TORTS ch. 15, topic 2, intro, note at 394 (nondelegability rules, which arise out of some relation toward the public or the particular plaintiff, "are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault"). Because "nondelegable" means that the control party may delegate the work but not the liability, the liability imposed under the nondelegable duty doctrine has long been described as "closely analogous to that of a master for the negligence of his servant." Id. A finding of a nondelegable duty is sufficient to establish vicarious liability.
¶ 80 While the Port is correct that RCW 4.22.070(1)(a) references only "agent" and "servant," this particular choice of words alone does not evidence the legislature's intent to abrogate the nondelegable duty doctrine. The doctrine operates exactly the same as other rules of vicarious liability. Indeed, it was intended to expand beyond traditional principal-agent relationships so that those *924 with control over complex work sites could no longer avoid liability by using "independent contractors" rather than direct agents. See RESTATEMENT ( THIRD ) OF TORTS : LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 57 cmt. b ( AM. LAW INST. 2012) ("The label 'nondelegable duty' does not mean that an actor is not permitted to delegate the activity to an independent contractor. Rather, the term signals that the actor will be vicariously liable for the contractor's tortious conduct in the course of carrying out the activity."); RESTATEMENT ( SECOND ) OF TORTS ch. 15, topic 2, intro, note at 394 (nondelegable duties "arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor").
¶ 81 In sum, RCW 4.22.070(1)(a) preserves joint and several liability in vicarious liability contexts recognized in agency law. The nondelegable duty doctrine, as a form of vicarious liability recognized in agency law, is therefore encompassed within the traditional joint and several liability retained in RCW 4.22.070(1)(a). Consistent with the Port's nondelegable duty, the Court of Appeals properly held that the Port is vicariously liable for the airlines' breach of the duty to provide a safe workplace and was not entitled to reduce its liability based on an allocation of fault to the nonparty airlines. AfoaII , 198 Wash. App. at 234, 393 P.3d 802. Regardless of whether it was appropriate under RCW 4.22.070 to allow the airlines to be listed as "empty chairs" in the first instance, the Port is jointly and severally liable for breach of both its own duty and the airlines' duty to maintain a safe workplace. The trial court should have entered judgment against the Port for the airlines' assigned fault as well as for the Port's assigned fault.[9]
IV. The Majority's Inflexible Interpretation of RCW 4.22.070(1)(a) Essentially Destroys the Safe Workplace Doctrine and Undermines WISHA
¶ 82 The majority's interpretation of RCW 4.22.070(1)(a) as requiring a factual showing of a principal-agent or master-servant relationship essentially destroys the workplace safety doctrine and will result in general contractors and jobsite owners passing off liability to subcontractors and others who commit safety breaches. It represents a step backward from our recognition in AfoaI that vicarious liability under the nondelegable duty doctrine is intended "to place the safety burden on the entity in the best position to ensure a safe working environment." 176 Wash.2d at 479, 296 P.3d 800. The majority retreats to labels-"agent" and "servant"-despite the recognition in AfoaI that we must "look[ ] beyond mere labels and consider[ ] the principles and policies that underlie our doctrine." Id. at 475, 296 P.3d 800. "The common law owes its glory to its ability to cope with new situations, and its principles are not mere printed fiats but living tools to be used in solving emergent problems." Id. at 480, 296 P.3d 800.
¶ 83 Interpreting RCW 4.22.070 to abrogate vicarious liability under the nondelegable duty doctrine not only disregards the evolution of our common law but also creates a conflict between two statutes, WISHA and RCW 4.22.070. Under WISHA's specific duty, though a general contractor and a subcontractor have a shared duty to ensure WISHA compliance, the general contractor has the primary responsibility to ensure the safety of all workers on the jobsite. The subcontractor retains concurrent responsibility to meet workplace safety standards in performing its work. Here, it is undisputed that the airlines, no less than Afoa's employer, EAGLE, had a duty to maintain workplace safety. But their duty is limited to the scope of their work because, unlike a general contractor or owner, subcontractors do not have innate supervisory authority over the jobsite. Stute, 114 Wash.2d at 463, 788 P.2d 545. Because the general contractor has the primary duty to ensure WISHA compliance, a subcontractor's violation of WISHA is *925 chargeable to both the subcontractor and the general contractor. The majority's holding creates a direct conflict between RCW 4.22.070 and WISHA.
¶ 84 In creating this false conflict, the majority decision renders meaningless statutorily recognized indemnity rights. Chapter 4.22 RCW preserves contractual indemnity rights between responsible parties because they are jointly and severally liable. See RCW 4.22.040(1) (recognizing right of contribution among joint tortfeasors). "If a general contractor and a subcontractor are severally liable to an injured employee, there would be no need for an indemnification agreement at all on any project." Moen, 128 Wash.2d at 760, 912 P.2d 472. The majority's decision conflicts with Moen by failing to appreciate that any concurrent negligence by the airlines remains chargeable to the Port in the first instance precisely because its duty to Afoa is a nondelegable duty. Even if the airlines could be described as owing separate concurrent nondelegable duties-which they cannot be in the absence of any jury finding of workplace control-the liability between the Port and the airlines would remain joint and several. Moen could not be clearer about this point. Id. at 761-64, 912 P.2d 472. The Port remains vicariously liable for the airlines' negligence, without regard to whether the contracting parties might have independent indemnification rights to "settle up" their relative responsibilities.[10]
CONCLUSION
¶ 85 The Court of Appeals correctly recognized the consequence of the Port's breach of its nondelegable duty to provide a safe workplace to Afoa: the Port is liable for its own negligence and vicariously liable for negligence of others at the work site, including the airlines. Because RCW 4.22.070 preserves vicarious liability under the nondelegable duty doctrine, the trial court should have entered judgment holding the Port jointly and severally liable for the proportionate share of fault assigned to the airlines. I would remand for entry of a corrected judgment against the Port.
Wiggins, J.
Owens, J.
Johnson, J.

Afoa also brought a claim of premises liability, which this court recognized in Afoa I .176 Wash.2d at 467-69, 296 P.3d 800. The jury found in favor of the Port on the premises liability claim, and it is no longer before us.

The majority nonetheless insists "there is no clearly established common law right to hold tortfeasors with a nondelegable duty vicariously liable for another entity's breach of the same duty." Majority at 910. For support, it cites only Wenatchee Wenoka Growers Ass'n v. Krack Corp., 89 Wash.2d 847, 849-50, 576 P.2d 388 (1978), which has nothing to do with vicarious liability for nondelegable duties but simply identifies the difference between comparative negligence and contribution principles. The majority erroneously dismisses the nondelegable duty line of cases as irrelevant on the mistaken notion that they require an actual delegation of nondelegable duties. Majority at 910-11 & n.10. But, as our opinion in AfoaI makes clear, the retained right of control gives rise to the duty regardless of whether aspects of the work are delegated, not because aspects of the work are delegated. The conclusion the majority draws-limiting liability for breach of a nondelegable duty to the defendant's "proportionate share of responsibility," id. at 910 n.10-is undercut by the very cases it relies on. See Millican v. N.A. Degerstrom, Inc., 177 Wash. App. 881, 896-97, 313 P.3d 1215 (2013) (" 'a "non-delegable duty" requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted' " (quoting Restatement ( Second ) of Torts eh. 15, topic 2, intro, note at 394) ); Wiggs, 198 Ariz. at 371, 10 P.3d 625 (recognizing nondelegable duty doctrine creates agency relationship "as a matter of law ... for purposes of applying the doctrine of respondeat superior " and noting "it does not make legal or tactical sense to name as a non-party at fault, the party whose conduct is imputed to the employer, because the employer will be fully liable for that fault").

Under the SLOAs, "[t]he Port owns and operates [the airport] and has the authority to grant to Airline rights and privileges concerning the occupancy and use of the Airport." Def. Ex. 675, at 271; Def. Ex. 676, at 3459; Def. Ex. 677, at 3642; Def. Ex. 678, at 184. Section 2.1 of the SLOAs states, "The Port grants to Airline a nonexclusive license to use the Airfield Area, in common with others, subject at all times to the exclusive control and management by the Port ." Def. Ex. 675, at 277; Def. Ex. 676, at 3465; Def. Ex. 677, at 3648; Def. Ex. 678, at 190 (emphasis added).

The licensing agreement required EAGLE to comply with all port rules and regulations. CP at 8377 ("Licensee shall comply with all Port regulations including the Port's SCHEDULE OF RULES AND REGULATIONS" for Sea-Tac Airport). Under the licensing agreement, "[a]s solely determined by the Port, equipment appearing to or unoperational is subject to towing, impoundment and storage charges." Id.

Under the Port's general rules and regulations, "[a]ll persons on the Airport property shall be governed by the rules and regulations herein prescribed and by orders and instructions of the Commission." Def. Ex. 482, at 31. Additionally, a port rule states, "No person shall operate any ... motorized equipment in the Air Operations Area of the Airport unless such ... motorized equipment is in a reasonably safe condition for such operation." Id. at 54.

The instruction also set forth the Port's affirmative defense alleging that EAGLE committed these same acts of negligence. CP at 4796.

The Port did argue that federal aviation law preempted claims based on retained control at Sea-Tac Airport, but we expressly declined to grant review of the preemption issue, as the majority recognizes. See majority at 908 n.4. It is therefore unclear why the majority finds it significant that: "[t]he relationship between the Port and the airlines is highly regulated under federal law, which makes these relationships different from most worksites in the state. In fact, the Port is prohibited from controlling certain aspects of airline operations." Id. at 907 n.1 (citing 14 C.F.R. pts. 139 (Airport Certification), 121 (Air Carrier Certification) ). If this is a veiled preemption argument, it has no place in our analysis of the Port's conceded nondelegable duty.

See also Kottler, 136 Wash.2d at 446, 963 P.2d 834 (noting RCW 4.22.070 's preservation of traditional vicarious liability in agency law); Restatement ( Third ) of Torts : Apportionment of Liability § 13 cmt. b reporters' note at 115 ( Am. Law Inst. 2000) (citing RCW 4.22.070(1)(a) as an example of a statute that "state[s] explicitly that vicariously liable parties remain jointly and severally liable").

The majority mischaracterizes the Port's nondelegable duty as "minimiz [ing ] the airlines' responsibility under our system of comparative fault." Majority at 912 (emphasis added). Again, the majority misses the very point of the nondelegable duty doctrine as a theory of vicarious liability-the Port, as a jobsite owner with retained control over a multiemployer work site, retains legal responsibility for the safety breaches by others on the jobsite.

Unsurprisingly, the Port's lease agreement with each airline contains an indemnification clause for this exact purpose. The airlines have a duty to indemnify the Port for all liability arising from injuries sustained by any person directly or indirectly employed by the airlines, including "subcontractors" like Afoa. See CP at 8148. Under the indemnification clause, "[a]ny final judgment rendered against the Port for any cause for which Airline is liable hereunder shall be conclusive against Airline as to liability." Id. As in other multiemployer contexts, the Port may shift liability to the airlines using the indemnification agreement. It is the indemnification agreement that "ensure[s] a party generally will not have to bear financial responsibility for the fault of another." Moen, 128 Wash.2d at 761, 912 P.2d 472. The majority needlessly dismantles the nondelegable duty doctrine and RCW 4.22.070 in order to solve a perceived unfairness that does not exist.